**In the Matter of Cloyce Gilbert LITTLE LIGHT, Appellant,**

v.

**Roger W. CRIST, Warden, Montana State Prison, Mike Greely, Attorney General, State of Montana, Appellees.**

No. 79–2714.

United States Court of Appeals, Ninth Circuit.

Submitted Nov. 4, 1980.

Decided Feb. 17, 1981.

Cloyce Gilbert Little Light, pro se, on briefs.

John H. Maynard, Helena, Mont., on briefs, for appellees.

Before SNEED and ANDERSON, Circuit Judges, and EAST,* District Judge.

PER CURIAM:

Cloyce Gilbert Little Light, appearing pro se (Little Light), appeals the summary dismissal of his 28 U.S.C. § 2254 habeas corpus petition and action entered by the District Court on November 30, 1979, pursuant to Rule 4 of the Rules Governing § 2254 Cases. We note jurisdiction under 28 U.S.C. § 2253 and affirm in part and remand in part.

*Proceedings in state courts:*

Little Light was convicted and sentenced in a Montana court on the charge of forcible rape of an elderly woman within the town of Hardin, Montana, on March 31, 1964. Sheriff's deputies arrested him, without a warrant, on the Crow reservation on April 1. On April 2, the justice of the peace issued a warrant of arrest. Little Light was arraigned, informed of his rights, waived a preliminary hearing, and entered a plea of guilty on that date, although he now contends he never pleaded guilty.

On April 9, 1964, the state filed an information, charging Little Light with rape. The minutes of the Montana trial court disclose that Little Light was arraigned on that date, waived his right to counsel and trial by jury, and entered a plea of guilty, although again Little Light contends he never entered a plea of guilty. The court desired the state to secure more evidence, and advanced the time for pronouncing judgment to April 23, and fixed bail in the sum of $3,000.

On April 23, 1964, Little Light again appeared before the court, requested more time, and indicated he would be able to secure counsel. Further proceedings were continued to May 7. When Little Light again appeared without counsel, the court appointed an attorney to represent him. Little Light was rearraigned, and the matter continued to May 21.

On May 21, 1964, Little Light appeared with appointed counsel. Several witnesses testified, and the minutes indicate that Little Light entered a plea of guilty, although he continues to contend he never entered such a plea. He was sentenced to 25 years at hard labor. Later he was paroled, charged with a parole violation, and re-

* Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

turned to Deer Lodge, where he is currently incarcerated.

In 1967, Little Light contacted an attorney. The attorney filed a state habeas corpus petition, characterized by Little Light as shoddy, which was rejected by the Montana Supreme Court. In 1977, Little Light contacted a different attorney, who filed another habeas petition with the Montana Supreme Court. This time the Court referred the petition to the sentencing court for determination. That court held an evidentiary hearing on October 11, 1978. On November 20, 1978, the court issued findings and conclusions with an order denying the petition. The Montana Supreme Court issued an order to show cause why the petition should not be dismissed. Briefs and the trial court transcript were filed. On July 16, 1978, the Montana Supreme Court denied the petition.

*Proceedings in the District Court:*

On November 30, 1979, Little Light filed these proceedings in the District Court. On that same day, the District Court summarily dismissed the petition and cause pursuant to Rule 4 of the Rules Governing § 2254 Cases.

Little Light timely filed his notice of appeal on December 12, 1979. The District Court entered the required Certificate of Probable Cause on December 20, 1979.

*Little Light's constitutional claims:*

*Issues:*

We perceive from Little Light's petition in the District Court two constitutional claims:

1. A challenge to the jurisdiction of the Montana state courts over the underlying crime because the area of the Town of Hardin in Indian Country, subject to the exclusive jurisdiction of Federal authorities.

Little Light contends that he is a Crow Indian, and the area of the alleged crime is a part of the Crow Reservation. He submits that a treaty, between the Crow People and the United States and ratified by Congress, entered into subsequent to the establishment of the Crow Reservation, did not disestablish the area of the Town of Hardin from the exterior boundaries of the reservation.

2. While inaptly and obscurely presented, Little Light asserts, in effect, that his habeas claims were not accorded a full and fair hearing by the state courts and that the District Court, through the vehicle of a Rule 4 summary dismissal of his § 2254 petition and action, did not comply with the dictates of *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). These habeas claims include the contentions that he entered no plea of guilty (or, liberally read, that his guilty plea was not knowingly and voluntarily entered) and that he received no assistance of counsel (or liberally read, no reasonably effective counsel was afforded).

Little Light asserts for the first time on appeal an additional theory as to why the state courts lacked jurisdiction over his offense. This claim is based upon an allegation that in 1904 the Lincoln Land Company, desiring to establish a town site on lands owned by the heirs of deceased Indians (the area of Hardin), induced the heirs by illegal means to select other allotments in exchange for their ancestors' lands. Little Light concludes that the exchanges to the Land Company were invalid and that the area remains Indian country.

*Discussion*

 We are initially presented with the question of whether this court should address any of the substantive claims in light of the presence of the unexhausted jurisdictional theory. *Gonzales v. Stone,* 546 F.2d 807 (9th Cir. 1976). However, when considerations of fairness dictate, a federal court may hear exhausted issues even when unexhausted claims are present.[1] *Id.* at 810. *West v. Louisiana,* 478 F.2d 1026, 1034–35 (5th Cir. 1973), *affirmed en banc,* 510 F.2d 363 (5th Cir. 1975). Here, we take into account Little Light's long period of incarceration, that he is bringing

---

1. We consider this new theory, supporting Little Light's jurisdictional claim, to be the equivalent of a new claim in that the state court has not had the opportunity to pass on its merits.

this petition *pro se*, that he has raised this unexhausted claim for the first time on appeal, that refusal to proceed further will require the process to start all over again in the state courts, and that the state has not here raised the exhaustion question. These circumstances persuade us that we should proceed to address Little Light's exhausted claims. *See Kelley v. Estelle*, 521 F.2d 238, 240–41 (5th Cir. 1975).

(1) The Challenges to the State Court's Jurisdiction

■ It appears that the Honorable James F. Battin, the District Judge hearing Little Light's petition in the District Court, had previously considered the identical issue in a cause entitled *Hawkins v. Crist*, No. CV–76–99–BLG, then pending in the District Court for the District of Montana. In a thoroughly well reasoned and well written, but unpublished, opinion, Judge Battin concluded that issue adversely to the contention of Little Light in this case. A copy of that opinion marked Appendix is attached hereto. We subscribe to the rationale of that opinion and agree with Judge Battin's declaration that under the rationale of *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977), the congressional act involved was valid. It is manifest to us that the District Court considered the holding in *Hawkins* to be the law of the District of Montana and adhered to it without recitation in its order of dismissal of this cause.

We hold that the area of Hardin, Montana was disestablished from the exterior boundaries of the Crow Reservation and the courts of Montana had lawful jurisdiction of the underlying crime charged against Little Light. The contention of Little Light is without merit and the District Court did not err in this regard.

(2) Claims of Involuntary Plea of Guilty and Lack of Competent Counsel

■ The District Court summarily dismissed the habeas petition after reviewing the petition and the accompanying excerpts, which constituted the only parts of the state habeas trial court's record before the District Court.

■ *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), outlines three steps the District Court must follow in habeas proceedings. First, the court must consider whether petitioner's allegations, if proved, establish a right to his release. Second, if the petition raised cognizable claims, the District Court must decide if these issues were accorded a full and fair hearing in the state trial court. If not, the District Court must hold an evidentiary hearing on those claims. Third, the District Court must independently apply principles of federal law to the state factual findings. An evidentiary hearing is mandatory if any of the following six circumstances are present: (1) the merits of the factual dispute were not resolved at the state hearing, (2) the state factual determination was not fairly supported by the record, (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing, (4) there were substantial allegations of newly discovered evidence, (5) material facts were not adequately developed at the state hearing, and (6) for any other reason it appears that the state trier did not afford petitioner a full and fair fact hearing.

The material before the District Court was insufficient to permit it to determine whether Little Light was accorded a full and fair hearing on his constitutional claims. The excerpts accompanying the habeas petition were exactly that—mere excerpts covering brief portions of the various state trial proceedings. Further, the opinion of the Supreme Court of Montana, affirming the denial of Little Light's 1977 state habeas petition, does not reveal a basis for the District Court to make an independent determination of the state fact-finding process.

Because Little Light's petition raised cognizable claims, *Townsend* required the District Court to review the state fact-finding proceedings before accepting the findings against the petitioner. Here, these adverse findings were made by the trial court which

considered the 1977 state habeas petition. Without the transcript of these proceedings, the District Court could not have determined the adequacy of the state process. *Townsend,* 372 U.S. at 319, 83 S.Ct. at 760. Thus, it was improper for the District Court to summarily dismiss Little Light's petition on the record before it in this case.

We vacate the District Court's summary dismissal of Little Light's petition and action as entered on November 30, 1979, and remand the cause to the District Court. On the remand, the District Court should obtain the record of the state trial court hearing the 1977 state habeas petition and, if necessary, conduct an evidentiary hearing, and enter appropriate findings, conclusions and order as required by *Townsend. See* 28 U.S.C. § 2254(e).

AFFIRMED IN PART AND REMANDED IN PART.

## Appendix

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

------------------------------------

| | | |
|---|---|---|
| SHERMAN P. HAWKINS, | ) | |
| Petitioner, | ) | CV–76–99–BLG |
| —vs— | ) | |
| ROGER W. CRIST, Warden of the Montana State Prison, and THE STATE OF MONTANA, | ) ) ) | MEMORANDUM AND ORDER |
| Respondents. | ) | |

------------------------------------

BATTIN, District Judge.

Sherman P. Hawkins is currently in the custody of the State of Montana, serving a life sentence for first degree murder. He filed the instant application for a writ of habeas corpus, alleging that the State Court which rendered the judgment against him lacked jurisdiction. Hawkins alleges that the offense occurred in "Indian country," [1]

and was therefore under the exclusive criminal jurisdiction of the United States. The offense occurred on a tract of land within the original exterior boundaries of the Crow Reservation, established under the Treaty of May 7, 1868, 15 Stat. 649. Pursuant to an agreement ratified by the Act of April 27, 1904, 33 Stat. 352, the Tribe agreed to "cede, grant and relinquish" its interest in the tract in exchange for certain consideration. The Court concludes that this Act has the effect of disestablishing the tract as "Indian country," thereby rendering it subject to state criminal jurisdiction. The petitioner's application will therefore be denied.[2]

In *United States v. Celestine,* 215 U.S. 278, 285, 30 S.Ct. 93, 95, 54 L.Ed. 195 (1909), the Supreme Court announced the general rule governing questions of disestablishment: "[W]hen Congress has once established a reservation, all tracts included within it remain a part of the reservation until separated therefrom by Congress." The applicability of this rule is demonstrated in four subsequent Supreme Court decisions. *Seymour v. Superintendent,* 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962), presented basic facts somewhat similar to those in the case at bar. Seymour was convicted in state court of a burglary committed within the original boundaries of the Colville Reservation, on land opened to settlement by the Act of March 22, 1906, 34 Stat. 80. He petitioned for a writ of habeas corpus, alleging that the state lacked criminal jurisdiction since the offense occurred in "Indian country." The Supreme Court agreed. The Court compared the language of the 1906 Act with that of an 1892 statute which provided that the North Half of the Colville Reservation was "vacated and restored to the public domain." In contrast, the 1906

---

1. Under 18 U.S.C. § 1152, "the general laws of the United States as to punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States ... shall extend to Indian country." Under 18 U.S.C. § 1153, homicide committed in Indian country is within the exclusive jurisdiction of the United States. 18 U.S.C. § 1151 defines "Indian country" to mean, *inter alia,* "all land within the limits of any Indian reservation." It therefore follows that if the land on which the

offense occurred remained "Indian country", the state courts were without jurisdiction.

2. It is uncontested that petitioner has exhausted his State remedies, satisfying the requirements of 28 U.S.C. § 2254(b). This Court, therefore properly has jurisdiction. Neither party has requested an evidentiary hearing, *see* Rule 8, Rules Governing Section 2254 Cases, and I conclude that none is required on this record.

Act merely "provided for the sale of mineral lands and for the settlement and entry under homestead laws of other surplus lands *remaining on the diminished Colville Reservation* after allotments were first made and patents issued for 80 acres of land to 'each man, woman, and child'" among the tribal members. 368 U.S. at 355, 82 S.Ct. at 427 (emphasis added).

The Court found that the language of the 1892 statute explicitly disestablished the North Half of the Reservation. However, the Court concluded that the 1906 "Act did no more than open the way for non-Indian settlers to own land on the reservation in a manner which the Federal Government, acting as guardian and trustee for the Indians, regarded as beneficial to the development of its wards." *Id.* at 356, 82 S.Ct. at 427. The Court found further support for this interpretation in subsequent legislation referring to "the existing reservation," and in the construction of the 1906 Act followed by the Department of the Interior. The Court concluded that the South Half of the reservation was not disestablished, and that the State was therefore without criminal jurisdiction.

In *Mattz v. Arnett,* 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973), the petitioner, a Klamath River Indian, intervened in an action seeking forfeiture of certain gill nets confiscated from him within the confines of the original Klamath River Reservation in California. The respondent game warden argued that he was entitled to confiscate the nets since the confiscation took place in land under state jurisdiction. Petitioner claimed that the area was "Indian country" and therefore under the exclusive jurisdiction of the federal government.

The Court initially examined the history of the reservation, from its creation in 1855 to June 17, 1892, the date of the Act which

allegedly disestablished the reservation. The Court concluded that the reservation was clearly in existence prior to the date of the Act. The Court then examined the terms of the Act, which were quite similar to those considered in *Seymour.* It provided "[t]hat all lands embraced in what was Klamath River Reservation ... are hereby declared to be subject to homestead, entry, and purchase under the laws of the United States granting homestead rights ...."[3] The Act further provided that homestead by white settlers would only be allowed as to land not allotted to Indians, and that the "proceeds arising from the sale of said lands shall constitute a fund ... for the maintenance and education of the Indians ...." *Id.* at 495, 93 S.Ct. at 2253. The Court found this arrangement to be "completely consistent with continued reservation status", citing *Seymour. Id.* at 497, 93 S.Ct. at 2254.

Prior legislative history was found to support the Court's construction. The 1892 Act was markedly different from prior legislative attempts to explicitly abolish the reservation. Further support was found in the construction placed on the Act by the Department of the Interior and in subsequent Congressional Acts. The Court concluded that the reservation was not disestablished by the 1892 Act.

The Court reached an opposite conclusion in *DeCoteau v. District County Court,* 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975), a case involving the Lake Traverse Reservation in South Dakota. The case presented the consolidated appeal of two criminal defendants charged in state court with offenses committed on alleged reservation land, and the appeal of an Indian mother contesting state jurisdiction to adjudicate child custody matters on the alleged reservation. The State alleged that its assumption of jurisdiction was proper, based on an 1891 Act which ratified an

---

3. The fact that the Act referred to the reservation in the past tense was found to be no moment, in light of the peculiar history of the reservation. Due to legislation limiting the number of reservations in California, the Klamath River Reservation had previously been connected to and incorporated in the Hoopa Valley Reservation. The Court found the past tense usage in the Act to be insignificant for disestablishment purposes. 412 U.S. at 498–99, 93 S.Ct. at 2254–55.

agreement between the Indians and the Department of the Interior. The Act provided that the reservation land would be allotted in 160 acre tracts to each tribal member, and that the remaining unallotted land would be "ceded" to the United States in exchange for payment to $2.50 per acre. The Act appropriated funds by which to make this payment.

The Court initially noted that a reservation will not be held to be disestablished unless the "congressional determination to terminate [is] expressed on the face of the Act or [is] clear from the surrounding circumstances and legislative history." 420 U.S. at 444, 95 S.Ct. at 1093, quoting *Mattz*, 412 U.S. at 505, 93 S.Ct. at 2258. The Court then held that these factors clearly disclosed a Congressional intent to terminate.

The Court found that the Act ratified an agreement whereby for a sum certain in money the Indians agreed to "cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest" in the unallotted land. The Court contrasted this language with that from *Seymour* and *Mattz*, which merely allowed settlement of unallotted lands. The Court held that in the face of clearly established Congressional intent to disestablish, it could not construe the Act as providing for retention of exclusive federal jurisdiction.

The Court concluded its opinion in *DeCoteau* by distinguishing the case from *Mattz* and *Seymour*. The Court found it significant that this case involved a bilateral agreement whereby the Tribe agreed to relinquish its land in exchange for a sum certain, while *Mattz* and *Seymour* only dealt with a unilateral opening of reserved lands to settlement, with the Indians receiving a fund established by uncertain future sales. The Court concluded that *Mattz* and *Seymour* presented the "guiding principles" for decision of such cases, but that *DeCoteau* provided sufficiently dissimilar facts to justify a contrary result.[4]

The final Supreme Court statement on the point is found in *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977), which dealt with the effect of statutory enactments of 1904, 1907, and 1910 on the reservation status of a large portion of the Rosebud Sioux Reservation. The acts in question ratified in amended form a 1901 agreement between the Department of the Interior and the Tribes. The agreement was virtually identical to that considered in *DeCoteau*; it provided for the cession of some 416,000 acres in exchange for a lump sum payment of $1,040,000. In considering ratification, the Congress balked at payment for the land outright. Therefore, in ratifying the agreement, Congress amended the portion dealing with payment to provide (1) that the Indians would only receive consideration for the lands actually sold; and (2) that the United States would not "guarantee to find purchasers but agreed only to 'act as trustee for said Indians to dispose of said lands.'" 430 U.S. at 596, 97 S.Ct. at 1368.

The Court agreed that in technical usage a "cession" requires bilateral consent. However, the Court did not feel bound by technical usage. The Court found that the intent of Congress, when presented with the original 1901 agreement, was to disestablish the ceded portion. It held the mere change in method of payment to be insufficient to manifest a change in intent.

The Court also noted that other provisions of the Acts disclosed an intent to disestablish. For example, the conveyance of land to the United States reserved two sections of each township conveyed "for use of the common schools", which sections were conveyed to the State of South Dakota. The Court found this grant to the State to be consistent with the establishment of State jurisdiction over the ceded land on the same footing as that exercised over any non-reserved land.

It is clear from the foregoing cases that the determination of whether a reservation

---

4. *DeCoteau* specifically reaffirmed the precedential vitality of *Mattz* and *Seymour*. 420 U.S. at 449, 95 S.Ct. at 1095. Any suggestion that these cases are no longer good law is therefore clearly wrong; *DeCoteau* and *Rosebud Sioux* merely explain the prior cases.

has been disestablished involves a case-by-case analysis of three factors to determine the legislative intent:[5] (1) the language used by Congress; (2) the prior and subsequent history of the reservation; and (3) the legislative history. Of these, I think the most critical factor is the language of the statute, which obviously constitutes the clearest barometer of Congressional thinking. In this case, I find that the language strongly indicates disestablishment. The Tribe agreed to "cede, grant, and relinquish to the United States all right, title, and interest" in the tract. This language was found in *DeCoteau* to be "precisely suited" to a purpose of disestablishment.[6] 420 U.S. at 445, 95 S.Ct. at 1093. Further, the agreement clauses identified in *Rosebud Sioux* as being indicative of a Congressional intent to disestablish. The 1904 Act reserved two sections out of each township for state school purposes.[7] Further, Indians holding allotments in the ceded tract were permitted by the 1904 Act to apply for allotments within the "portion of the reservation not ceded, granted or relinquished."[8] Finally, the agreement and the 1906 Act expressly contemplated new boundary lines "for the purpose of segregating the ceded lands from the diminished reservation." This language unmistakably points to a Congressional intent to diminish the amount of land within the reservation boundaries.

Petitioner contends that the legislative history of the 1904 Act is sparse, and that such legislative history as can be found supports the conclusion that the tract was intended to remain Indian land. The items of legislative history cited by respondents flatly contradict this assertion. In fact, the legislative history of the 1904 Act closely parallels that of the 1904 Act in Rosebud Sioux. Both were passed to amend and ratify prior agreements. In both cases the prior agreements provided for an outright sale which would constitute a disestablishment under *DeCoteau*. See, *Rosebud Sioux*, 430 U.S. at 591, 97 S.Ct. at 1365. In both cases, the original agreements were amended as to method of payment, reflecting Congressional dissatisfaction with the lump sum method of payment. These similarities are not coincidental. Respondents cite the final Senate Report on the Crow Act, which states:

> This bill is almost identical with H.R. 10418, known as the Rosebud Indian bill, which has already passed this house at the present session of Congress.

It is clear that the enactment of the 1904 Act was a result of the same "familiar forces" which motivated the Congress to disestablish the Rosebud Reservation. See, *Rosebud Sioux*, 430 U.S. at 590, 97 S.Ct. at 1365. I therefore conclude that here, as in *Rosebud Sioux*, the legislative history supports a finding of disestablishment.[9]

---

5. The Court in *Rosebud Sioux* made clear that the factors identified in these cases are not absolutes. Rather, the Court must balance a number of co-equal factors to arrive at a conclusion on the question of legislative intent. 430 U.S. at 588 n. 4, 97 S.Ct. at 1364, n. 4.

6. In *Russ v. Wilkins*, 410 F.Supp. 579 (N.D.Cal. 1976), the Court collected in table form the operative language of the several cases dealing with disestablishing acts. The cases there collected illustrate the distinction between disestablishment language and language which *merely opens a reservation for settlement*. *Id.* at 584.

7. The states of Montana and South Dakota were created by the same enabling act of February 22, 1889, 25 Stat. 679. It therefore appears that the Supreme Court's reasoning regarding the "school sections" provisions in *Rosebud Sioux*, 430 U.S. at 599–601, 97 S.Ct. at 1369–1370, would apply with equal force here.

8. *See, Rosebud Sioux* at 613, 97 S.Ct. at 1376.

9. Petitioner suggests in his opening brief at 11–12 that an alternative reading of the statute would construe it to be a "special allotment", *viz.*, one which divides and allots a reservation with the goal of termination at some future time. He contends that the intended termination of the tract was forestalled by the Indian Reorganization Act of 1934. He cites no language in the Act to support this proposition, and my reading of the Act discloses nothing that even remotely suggests it. Further, petitioner offers *no reason why the Court should construe this Act as a "special allotment act"* when the Supreme Court in *Rosebud Sioux* held that a virtually identical statute effected a disestablishment of the reservation there in question. *See generally, Rosebud Sioux*, 430 U.S. at 604 n. 27, 97 S.Ct. at 1372, n. 27, regarding the effect of the Indian Reorganization Act.

The element of subsequent history which provides the strongest index of congressional intent is the "jurisdictional history." For example, the Court in *Rosebud Sioux* found that the State of South Dakota had exercised "unquestioned ... jurisdiction over the unallotted lands ... since the passage of the 1904 Act ...." 430 U.S. at 603, 97 S.Ct. at 1371. The Court concluded from this fact that

[T]he longstanding assumption of jurisdiction by the State over an area that is over 90% non-Indian, both in population and land use, not only demonstrates the parties' understanding of the meaning of the Act, but has created justifiable expectations which should not be upset by so strained a reading of the Acts of Congress as petitioner urges.

*Id.* at 604–5, 97 S.Ct. at 1372.

In this case, it is unclear whether the State of Montana has consistently exercised its criminal jurisdiction over the tract. However, respondents argue that the Crow Tribe and the federal government have, since 1905, treated the tract as non-reservation land. This is not denied by the petitioner, and the maps and data filed by respondents with their brief tend to support respondents' claim. I find it highly unlikely that the Crow Tribe would relinquish its claim to the tract were it not of the opinion that the tract had been disestablished. Thus, the subsequent history of the tract has not been shown to be inconsistent with a Congressional intent to disestablish.[10]

In sum, I find no meaningful distinction between the case at bar and the *Rosebud Sioux* case decided by the Supreme Court. The language and legislative history of the statutes and the subsequent history of the tracts involved are virtually identical. Since petitioner has neither pointed to any meaningful distinctions nor posed any plausible alternative constructions of the Act, I feel bound to decide the case in accordance with the dictates of *Rosebud Sioux*.

In consideration of the foregoing,

IT IS HEREBY ORDERED that the petitioner's application for a writ of habeas corpus be, and the same hereby is, denied.

The Clerk is directed to notify the parties of the entry of this order.

Done and dated this 27th day of January, 1978.

---

**10.** Petitioner relies heavily on the Supreme Court's decision in *Ash Sheep Co. v. United States,* 252 U.S. 159, 40 S.Ct. 241, 64 L.Ed. 507 (1920). In that case, the Supreme Court held that the 1904 Act did not make the tract "public lands" as that term is defined in an act relating to the grazing of livestock. The Court held that the land was held by the United States in trust until sold, and that the trust relationship required the land to be considered "Indian land" rather than "public land" for grazing purposes.

The Supreme Court considered the impact of *Ash Sheep* on the disestablishment question in *Rosebud Sioux.* The Court held the "public land-Indian land" dichotomy of *Ash Sheep* to be substantially irrelevant to the question of disestablishment, stating

As recognized by the Court of Appeals [in *Rosebud Sioux Tribe v. Kneip,* 521 F.2d 87 (8th Cir. 1975)], "the fact that a beneficial interest is retained does not erode the scope and effect of the cession made, or preserve to the reservation its original size, shape, and boundaries." 521 F.2d at 102. The question of whether lands become "public lands" under [*Minnesota v. Hitchcock,* 185 U.S. 373, 22 S.Ct. 650, 46 L.Ed. 954 (1902)] and *Ash Sheep,* is therefore, logically separate from a question of disestablishment.

430 U.S. at 601 n. 24, 97 S.Ct. at 1370 n. 24.