**Winfield C. PATTERSON, Appellant,**

v.

**Julius T. CUYLER, Superintendent, and the Attorney General of the State of Pennsylvania.**

No. 82–1394.

United States Court of Appeals, Third Circuit.

Argued Jan. 9, 1984.

Decided March 13, 1984.

Edward H. Weis (argued), Acting Atty.-in-Charge, Defender Ass'n of Philadelphia, Philadelphia, Pa., for appellant.

Kenneth S. Gallant (argued), Asst. Dist. Atty., Jane Cutler Greenspan, Chief, Appeals Unit Philadelphia, Pa., for appellees.

Before ALDISERT, HIGGINBOTHAM and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

The petitioner, Winfield Charles Patterson, appeals from the district court's denial of his habeas corpus petition. Patterson claims that he was entitled to a hearing in the district court on his claims (1) that he should have been given *Miranda* warnings before his interview at 7:05 a.m. on February 22, 1977 because he was then in custody and (2) that his waiver of the right to remain silent after he was given *Miranda* warnings was not knowing and voluntary. We will affirm the district court's decision.

I.

### Facts and Procedural History

On February 21, 1977, the Philadelphia police discovered the bodies of Victor and Betty Soto and Mrs. Soto's fourteen-year-old daughter Wanda McKim. The elder Sotos had been bound with electrical cord and stabbed; Wanda had been strangled and subsequently drowned in the bathtub. Police then located Helen McKim, another daughter of Betty Soto, at the home of Ruth Stroman where she had been living since moving out of the Soto home, which police were told followed an argument with her mother. Police asked several people at that house who knew the victims to go to headquarters to provide background information about the family. Those who went included Patterson; his girlfriend, Charlinder Stroman; another friend, William Blannon; and Helen McKim, who was Blannon's girlfriend. None was handcuffed. Patterson was not a suspect at the time, and he does not claim that his trip to police headquarters was other than voluntary. Mrs. Stroman told a detective that Patterson and Blannon had been around the Soto residence that weekend, but the record does not show that the comment was communicated to the detectives who subsequently interviewed Patterson.

In 23 hours at police headquarters, starting at about 6:30 p.m. on February 21, Patterson underwent four interviews. He was first interviewed for 30 minutes in the waiting area by a police detective seeking background information. Patterson received no *Miranda* warnings. The detective ordered a polygraph test, but it was not conducted because Patterson was too

high on marijuana. Patterson concedes that at about 8:30 p.m. he was told by Sergeant Gibbons, the detective in charge of the case, that he was free to leave and was offered transportation home. Instead, he chose to wait for his girlfriend, Stroman, who was still being questioned. He remained in the waiting area overnight and was given breakfast there.

In the meantime, Blannon confessed to the three murders but did not implicate Patterson. Charlinder Stroman, however, had told police that she had been with both Blannon and Patterson all day of the murders. Sergeant Gibbons asked Detective Ansel to interview Patterson. He was not given *Miranda* warnings because, as the detectives testified, at this point they still did not consider Patterson a suspect but thought he was lying to provide an alibi for Blannon. This interview began at 7:05 a.m. in an interrogation room and continued until 8:45 a.m., during which Patterson again alibied for Blannon, saying they had been together all Saturday evening except for about ten minutes when Blannon went to get beer. After the interview Patterson was returned to the visitors' area.

Following this interview, Sergeant Gibbons reviewed the statements and saw the continued conflict. He instructed a detective to issue *Miranda* warnings to Patterson about hindering the prosecution if he gave false statements to alibi for Blannon. Patterson was interviewed again at 11:00 a.m., was given *Miranda* warnings, explicitly waived his *Miranda* rights, and stated that he had previously confused Friday and Saturday nights and did not know all of Blannon's actions on Saturday night when the murders occurred. The detective testified that Patterson appeared alert and relaxed, App. at 156a, although he had only an hour's sleep overnight. Patterson then agreed to take a polygraph test. When he asked the officer administering the test how he was doing, he was told he was not doing very well. Patterson then agreed to tell what he knew and wrote and signed a confession saying that he helped Blannon tie up the Sotos before Blannon stabbed them, and that he helped choke and drown

Wanda McKim. At the fourth interview, again preceded by *Miranda* warnings, Patterson gave a formal and detailed statement of his confession, which he read and signed at 4:52 p.m.

That evening, Patterson was charged with three counts of first-degree murder. He later moved to suppress all statements given to the police. Following a suppression hearing in Philadelphia Common Pleas Court, the court found that (1) the first two interviews were conducted while Patterson was not "in custody" within the meaning of *Miranda*, and therefore no *Miranda* warnings were required, App. at 217a; (2) Patterson was in custody as of 11:00 a.m., when the third interview began, at which point he received *Miranda* warnings, and "was no longer free to leave", App. at 215a; (3) all statements made while Patterson was in custody were "the product of an essentially free and unconstrained choice of the maker", App. at 218a; and (4) the waiver of his right to counsel was knowing, intelligent and voluntary, App. at 217a.

Patterson was convicted following a jury trial. In post-trial motions he again claimed that all of his statements were inadmissible because he had not been given *Miranda* warnings before his second interview and because his confession made after *Miranda* warnings was the product of a waiver that was not knowing and intelligent. The trial court denied the motions. The Pennsylvania Supreme Court affirmed his conviction and rejected Patterson's arguments as to the inadmissibility of the statements. *Commonwealth v. Patterson*, 488 Pa. 227, 412 A.2d 481 (1980).

In his habeas corpus petition filed in the district court, Patterson raised the same two issues. The magistrate found the claims were exhausted in state court, and concluded that petitioner had not overcome the presumption of correctness to be accorded the state court's findings under 28 U.S.C. § 2254(d) and *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). App. at 28a. The district court adopted the magistrate's report and recom-

mendations. Following Patterson's appeal, we remanded to the district court to obtain the state court records and to determine if the state courts' findings were adequately supported by the state court record. The magistrate concluded that they were, App. at 35a–47a, and the district court approved and adopted his Report and Recommendation, and returned the matter to this court. App. at 56a–57a.

## II.

### The Miranda Issue

We turn first to Patterson's claim that he was entitled to an evidentiary hearing before the habeas court on the question of whether the police administered *Miranda* warnings at the proper time. This is related to Patterson's contention that the exculpatory statement he gave during the second interview was inadmissible.[1] Under *Miranda v. Arizona,* a suspect must be given warnings when "taken into custody or otherwise deprived of his freedom by the authorities in a significant way." 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). The state courts have consistently rejected Patterson's argument that he was "in custody" before 11:00 a.m. on February 22 when he received his first *Miranda* warnings.

Patterson recognizes that under 28 U.S.C. § 2254(d), there is a presumption of correctness to such state court findings. He argues that he is entitled to a federal court hearing nonetheless under the exceptions in that statute, which list circumstances in which habeas courts may make de novo findings. *Brewer v. Williams,* 430

U.S. 387, 395–96, 97 S.Ct. 1232, 1237–38, 51 L.Ed.2d 424 (1977); *Procunier v. Atchley,* 400 U.S. 446, 451 & n. 6, 91 S.Ct. 485, 488 & n. 6, 27 L.Ed.2d 524 (1971). *See generally* L. Yackle, Postconviction Remedies 483–84 n. 28 (1981).

Patterson's first claim to a federal hearing is that the circumstances under which Charlinder Stroman, his girlfriend, remained at police headquarters until the afternoon of February 22 were not adequately developed in the state court hearings. He relies on the exceptions in § 2254(d)(3) and (6) and claims that he did not receive a full, fair, and adequate hearing in the state court proceeding.[2]

In response, the appellee argues that the petition for a writ of habeas corpus must be dismissed because Patterson did not present to either the state courts or to the district court any claim with regard to the detention of Stroman. Patterson replies that he does not present a new theory of law or a new constitutional claim, and at oral argument before us characterized his contention as "a factual complex or constellation which was not pointed out below."

The parties have failed to distinguish between the need to exhaust claims before the state tribunal, as mandated by section 2254, and the need to raise issues in the district court before they can be considered by the court of appeals. "The exhaustion doctrine is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings." *Rose v. Lundy,* 455 U.S. 509, 518, 102 S.Ct. 1198,

---

1. The respondents argue that since the only product of the second interview was an exculpatory statement, the error, if any, was harmless. Patterson argues that "[t]he inconsistent exculpatory statements, presented as confusing and obviously false certainly were powerful corroboration of the Commonwealth's contention that the confession was true and the exculpatory statements and testimony false." Appellant's Reply Brief at 7. Although we find this claim of prejudice somewhat tenuous, we are not sufficiently persuaded by the respondents' harmless error argument to dispose of the issue on that basis.

2. Petitioner does not claim he did not have the opportunity to raise in the state courts his factual argument with respect to the effect of Stroman's continued presence in the police station, but seems to contend that nonetheless the literal language of § 2254(d) requires a federal habeas hearing whenever there are factual issues that were not considered in the state proceedings. We reject that argument. We do not construe the congressional intent underlying the important principle of comity evinced by § 2254(d) as permitting evasion by a petitioner by the mere failure to raise the issue.

1203, 71 L.Ed.2d 379 (1982). If the petitioner has failed to exhaust available state remedies, we are not free to consider the petition absent highly unusual circumstances. *Id.* at 515–16, 102 S.Ct. at 1201–02. In this case, Patterson presented to the state courts the ultimate constitutional question as to whether he was in custody. His failure to make every factual argument to support that claim does not constitute a failure to exhaust. *See Picard v. Connor,* 404 U.S. 270, 277–78, 92 S.Ct. 509, 513, 30 L.Ed.2d 438 (1971); *Bisaccia v. Attorney General,* 623 F.2d 307, 310 (3d Cir.), *cert. denied,* 449 U.S. 1042, 101 S.Ct. 622, 66 L.Ed.2d 504 (1980).

Patterson's failure to argue before the district court that the continued presence of Stroman in police headquarters was a factor to be considered in the determination of whether he was in custody does not implicate the exhaustion requirement but instead the well-established rule that absent compelling circumstances an appellate court will not consider issues that are raised for the first time on appeal. *Singleton v. Wulff,* 428 U.S. 106, 120–21, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976); *Toyota Industrial Trucks U.S.A. v. Citizens National Bank,* 611 F.2d 465, 470 (3d Cir. 1979); *Newark Morning Ledger Co. v. United States,* 539 F.2d 929, 932 (3d Cir. 1976). This prudential policy seeks to insure that litigants have every opportunity to present their evidence in the forum designed to resolve factual disputes. By requiring parties to present all their legal issues to the district court as well, we preserve the hierarchical nature of the federal courts and encourage ultimate settlement before appeal. It also prevents surprise on appeal and gives the appellate court the benefit of the legal analysis of the trial court. *Cf. Hormel v. Helvering,* 312 U.S. 552, 556, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941) (same principle applicable to review of administrative agencies). It is, however, not a jurisdictional bar, and the statement of the policy permits exceptions in appropriate cases.

Patterson has not suggested any circumstances which would impel us to relax that

rule in this case, and thus we may legitimately decline to consider his contention insofar as it relates to Charlinder Stroman. We elect, however, to reach and dispose of the legal issue presented because the severity of the sentence which petitioner is serving prompts us to meticulously examine each of his legal claims lest one that is potentially meritorious be overlooked.

We therefore turn to Patterson's contention that because the facts of Stroman's presence at the police station were not fully developed at the state hearing, he is entitled to a federal hearing to develop the facts. A federal hearing on such factual disputes must be held only if the disputes are material to the outcome of the case. Thus, the threshold inquiry is whether the petitioner's allegations, if true, would entitle him to relief. *Procunier v. Atchley,* 400 U.S. at 451, 91 S.Ct. at 488; *Townsend v. Sain,* 372 U.S. 293, 312, 83 S.Ct. 745, 756, 9 L.Ed.2d 770 (1963); *Little Light v. Crist,* 649 F.2d 682, 685 (9th Cir.1981).

Petitioner has urged us to formulate a new rule of law "that a factor to be considered in determining whether or not a person is free to go is whether or not his girlfriend is being held," particularly when the person questioned has announced his intention not to leave without her. We categorically reject this rule. This court reaffirmed recently that "[t]o determine whether an individual is in custody, we use the 'objective test of whether the "government has in some meaningful way imposed restraints on [a person's] freedom of action."'" *Yount v. Patton,* 710 F.2d 956, 961 (3d Cir.1983), *cert. granted on other grounds,* —— U.S. ——, 104 S.Ct. 272, 78 L.Ed.2d 254 (1983). When the individual has not been arrested, a finding of "custody" requires some indication that the officers would not have heeded his or her request to depart. *Id.*

Patterson contends that the inquiry should expand beyond the freedom of the individual to depart, relying on *United States v. McCain,* 556 F.2d 253, 255 (5th Cir.1977), where the court held that the

defendant's interrogation by customs agents was "custodial" for the period that her baggage was being searched because she was free to leave only if she was willing to abandon her luggage. We believe the situations are not analogous. In *McCain*, it was clear that defendant had been in custody when she was taken to a private room and strip searched. Since she was questioned thereafter without being told she was free to leave, this alone provided ample basis for the court's conclusion that she was still in custody. In light of the totally disparate fact situation here, we need not decide whether we would adopt the Fifth Circuit's additional statement that the detention of her luggage alone would be sufficient for a finding that she was in custody.

Determinations as to whether a suspect is "in custody" must be made on a case-by-case basis, *United States v. Mesa*, 638 F.2d 582, 584 (3d Cir.1980), but there is no precedent and we see no reason to extend the definition of "custody" by a *jus tertii* approach.[3] We hold, therefore, that the only relevant inquiry is whether Patterson, the person claiming entitlement to *Miranda* warnings, was free to leave the police station before his second interview. Since the fact that his girlfriend was also being questioned is legally irrelevant to Patterson's claim that he was in custody, there was no reason to provide him with a federal evidentiary hearing to develop additional facts in connection with Stroman's presence at the police station.

Patterson's other claim of entitlement to a federal hearing is that the suppression court's finding that he was not "in custody" until 11:00 a.m. on February 22 is not fairly supported by the record. We find this contention plainly untenable. The suppression court heard testimony that Patterson was not compelled to go to police headquarters, that he was told he was free to leave at 8:30 p.m. on February 21 and was offered a ride home; and that he could have left during the night. This testimony was uncontradicted. The detectives also testified at the state hearing that Patterson was not considered a suspect when questioned during the second interview. Since there was sufficient evidence to support the state court's determination that Patterson was not "in custody" at the time of the second interview, the district court was not obliged to give Patterson an evidentiary hearing on this claim.

## III.

### The Voluntariness of Waiver

We turn next to Patterson's argument that he was entitled to a hearing in the district court on his claim that he did not knowingly, intelligently and voluntarily waive his right to remain silent. This argument underlies his contention that his confession, given after his *Miranda* warnings, should have been suppressed. The state courts rejected Patterson's argument, and concluded that the waiver was valid, and the confession voluntary.

We must first consider whether the state courts' conclusion was entitled to a presumption of correctness under 28 U.S.C. § 2254(d). In two earlier cases, *United States ex rel. Hayward v. Johnson*, 508 F.2d 322, 325–26 (3d Cir.), *cert. denied*, 422 U.S. 1011, 95 S.Ct. 2637, 45 L.Ed.2d 675 (1975); *United States ex rel. Rush v. Ziegele*, 474 F.2d 1356, 1358–59 (3d Cir.1973), we stated that voluntariness of a confession is a mixed question of law and fact to which the presumption of section 2254(d) does not apply. In each case, however, we agreed with the state courts' conclusion of voluntariness. Because the issue of "voluntariness" in the context of a *Miranda* waiver does not differ significantly from the issue of "voluntariness" of a confession for purposes of section 2254(d), we are bound to reconsider the issue guided by the Supreme Court's more recent and fuller explanation of section 2254(d).

---

**3.** We leave open the question whether detention of a minor child might so effectively limit the freedom to depart of the parent in certain circumstances that such detention may be considered to be custody of the parent.

■ In three recent decisions, the Supreme Court has reiterated the "high measure of deference" to which state court factual findings are entitled under section 2254(d) and *Sumner v. Mata,* 455 U.S. 591, 598, 102 S.Ct. 1303, 1307, 71 L.Ed.2d 480 (1982). The issue of the application of the presumption of correctness under section 2254(d) to mixed questions of law and fact was explicitly considered in *Maggio v. Fulford,* —— U.S. ——, 103 S.Ct. 2261, 76 L.Ed.2d 794 (1983). At issue was the application of the presumption to the finding that the defendant was competent to stand trial. As Justice White stated in his concurrence, earlier cases treated that question as "at least a mixed question of law and fact." *Id.* at 2265. Justice White and the three dissenters believed that section 2254(d) was not applicable because the issue of whether a defendant is competent is not a purely factual question. Nonetheless, the majority held that a federal habeas court could not overturn the state court "factual conclusions" as to competency without determining that these conclusions are not "fairly supported by the record," 28 U.S.C. § 2254(d)(8). *Id.* at 2264. Since the dissenters took issue on precisely this point, the inescapable conclusion is that "factual" conclusions based on questions of historical fact are subject to the presumption in section 2254(d), even when the ultimate issue is characterized as a mixed question of fact and law.

Earlier that term, in *Marshall v. Lonberger,* 459 U.S. 422, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983), the Court held that section 2254(d) was applicable to the issue whether a guilty plea is voluntary. The Court stated that even though "the governing standard as to whether a plea of guilty is voluntary for purposes of the federal Constitution is a question of federal law", "the questions of historical fact which have dogged this case from its inception—what the Illinois records show with respect to respondent's 1972 guilty plea, *what other inferences regarding these historical facts*

the Court of Appeals for the Sixth Circuit could properly draw, and related questions—are obviously questions of 'fact' governed by the provisions of § 2254(d)." *Id.* at 849 (emphasis added). The Court then made explicit that section 2254(d) applied to the state court's conclusion of "voluntariness" when it stated:

Applying this standard [that of *Henderson v. Morgan* [426 U.S. 637, 96 S.Ct. 2253, 49 L.Ed.2d 108 (1976)] presuming that in most cases defense counsel routinely explain the nature of the offense to give the accused notice of what he is being asked to admit] to the factual determinations arising from the state court proceedings which were "fairly supported by the record" within the meaning of 28 U.S.C. § 2254(d), we disagree with the Court of Appeals for the Sixth Circuit in its conclusion that respondent's plea to the Illinois charge was not "voluntary" in the constitutional meaning of that term.

*Id.* at 852 (footnote omitted).

In the most recent consideration of this issue, the Court in *Rushen v. Spain,* —— U.S. ——, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983), clarified the distinction between issues of federal law, as to which our review is plenary,[4] and the state courts' findings, which are entitled to a presumption of correctness. At issue was the state courts' finding that the jury deliberations were not biased. The Court, in holding that the Court of Appeals erred in failing to apply the presumption of correctness, stated that the final decision whether the alleged constitutional error was harmless is one of federal law, but continued, "The substance of the *ex parte* communications and their effect on juror impartiality are questions of historical fact entitled to this presumption. Thus, they must be determined, in the first instance, by state courts and deferred to, in the absence of 'convincing evidence' to the contrary, by the federal courts." *Id.* 104 S.Ct. at 456 (citing *Lonberger*).

---

4. For an illustration of a case in which the federal habeas courts have plenary review on the legal standard to be applied to a voluntary, knowing, and intelligent waiver of a right to have counsel present, see *Wyrick v. Fields,* 459 U.S. 42, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982).

In each of the three cases, the issue considered, competency, voluntariness of a guilty plea, and juror bias, may be characterized as a mixed question of law and fact. Since the Court applied section 2254(d) in each, over the dissenting view that it was inapplicable, we are led to the inescapable conclusion that our earlier statements in both *United States ex rel. Hayward v. Johnson, supra,* and *United States ex rel. Rush v. Ziegele, supra,* that mixed questions of law and fact are not governed by section 2254(d) are no longer accurate.

The *Lonberger* Court stressed that the reviewing court in a habeas case may not re-evaluate the credibility of witnesses. It continued: "We greatly doubt that Congress, when it used the language [of section 2254(d)] 'fairly supported by the record' considered 'as a whole' intended to authorize broader federal review of state court credibility determinations than are authorized in appeals within the federal system itself." 103 S.Ct. at 850. As long as the state court applied the correct legal standard, then the voluntariness issue is one to which the presumption of correctness applies under § 2254(d).

 There is no contention here that the state courts applied the wrong legal standard. Instead, as in *Lonberger,* the challenged finding of voluntariness of the waiver involves historical fact, and turned on the credibility of witnesses and the sufficiency of the evidence provided by their testimony. Therefore, we hold that the presumption of correctness of section 2254(d) must be applied.

Applying that presumption to Patterson's case, it is evident that the trial court did not err in dismissing his petition. There was ample testimony that he waived each of his *Miranda* rights before the third interview; that he was alert and relaxed and asked clarifying questions during interrogation; that he gave written consent to the polygraph test; that he was not high on drugs at the time; that he asked the polygraph operator how he was doing; that he then wrote out a statement; that he was advised of his rights a second time, and waived each, before the fourth interview; and that he read, amended and signed the statement written up from that interview. Further, the fact that on two subsequent occasions Patterson admitted complicity in the murders without any questioning at all provides additional support for the state courts' finding of voluntariness. At his arraignment the evening of his confession Patterson told the judge: "Wait awhile, Judge. I don't mind going to jail for what I did, but I'm not going to jail for what I didn't do. I didn't kill no three people. I just killed one." On his way back to detention, he told an officer, "I just killed the girl, the young girl." App. at 197a–198a. Neither of these statements was made in response to any question posed to Patterson. Since there is fair support in the record for the district court's conclusion that the state proved voluntariness, our inquiry need go no further.

We will affirm the district court's denial of the petition for habeas corpus.