NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-2342
No. 11-2343
_____

HOWMEDICA OSTEONICS,
a subsidiary of Stryker Corporation, a New Jersey corporation

v.

ZIMMER INC, a Delaware corporation;
ZIMMER US INC; ZIMMER SPINE INC; PAUL GRAVELINE, an individual;
CHRISTOPHER GIEBELHAUS, an individual; CHRISTOPHER LOUGHRAN,
an individual; RYAN LIVELY, an individual; RYAN HERMANSKY, an individual;
ZACH HILTON, an individual; THOMAS FALLON, an individual;
RUBEN BURCIAGA, an individual; ALEX POULEMANOS, an individual;
BRIAN ROWAN, an individual,

Christopher Giebelhaus, Paul Graveline,
Zimmer Spine, Inc, Zimmer US, Inc., Zimmer Inc.,

Appellants
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 11-cv-01857)
District Judge:  Honorable Katharine S. Hayden
_____

Argued January 26, 2012
Before:  AMBRO, CHAGARES and HARDIMAN, *Circuit Judges*.

(Filed: February 15, 2012)

David M. Monachino
James S. Yu
Seyfarth Shaw
32nd Floor
620 Eighth Avenue
New York, NY 10018

Michael D. Wexler [Argued]
Seyfarth Shaw
131 South Dearborn Street
Suite 2400
Chicago, IL 60603
                    *Attorneys for Plaintiff-Appellee*


Dana E. Becker
Rebecca Hillyer
Thomas B. Kenworthy [Argued]
Kenneth L. Racowski
Morgan, Lewis & Bockius
1701 Market Street
Philadelphia, PA 19103-0000

James P. Walsh
Morgan, Lewis & Bockius
502 Carnegie Center
Princeton, NJ 08540-0000
                    *Attorneys for Defendant-Appellants*


Thomas F. Doherty
McCarter & English
100 Mulberry Street
Four Gateway Center, 14th Floor
Newark, NJ 07102-0652

Michael S. Elvin [Argued]
Heather J. Macklin
Edward F. Malone
Barack Ferrazzano Kirschbaum & Nagelberg
200 West Madison Street
Chicago, IL 60606
   *Attorneys for Defendant-Appellee*

———————

OPINION OF THE COURT
———————

HARDIMAN, *Circuit Judge*.

  A subsidiary of Stryker Corp., Howmedica Osteonics Corp. (Stryker), brought breach of contract and tort claims against Zimmer, Inc., Zimmer U.S., Inc., Zimmer Spine, Inc., Paul Graveline, and Christopher Giebelhaus (the Zimmer Defendants), and against Christian Loughran,[1] Ryan Lively, Ryan Hermansky, Zach Hilton, Thomas Fallon, Ruben Burciaga, Alex Poulemanos, and Brian Rowan (the Individual Defendants). Stryker sought and obtained a temporary restraining order from the District Court. Stryker later obtained a preliminary injunction, from which the Zimmer Defendants and the Individual Defendants have appealed.

---

[1] Christian Loughran was incorrectly named as "Christopher Loughran" in the pleadings.

3

I

Because we write for the parties, who are well acquainted with the case, we recount only the essential facts and procedural history.

Stryker designs, manufactures, and sells spine-related medical devices. It employs sales representatives to market its products to hospitals and surgeons. Sales representatives are supervised by sales managers and branch managers, who are responsible for building customer relations and improving sales.[2]

The spinal products industry is a competitive field that relies heavily on customer relationships. Stryker sales representatives receive lists of surgeons in their respective sales territories and are expected to meet those customers and establish connections with them. After gaining the surgeons' trust, representatives typically are invited to attend surgeries, where they provide technical support and advice regarding the use of Stryker products. Representatives familiarize themselves with surgeons' individual preferences, and they assist surgeons in a variety of ways. As a result, representatives foster close relationships with their customers, and that loyalty redounds to Stryker's benefit.

---

[2] Before this suit began, Stryker's Arizona branch manager was Loughran, its Arizona sales manager was Lively, and its Arizona sales representatives included Hermansky and Hilton. Stryker's Las Vegas branch manager was Fallon, and its Las Vegas sales representatives included Burciaga, Poulemanos, and Rowan.

4

Sales representatives are responsible primarily for servicing their own clients, but they "cover" one another's surgeries when conflicts arise. In such cases, the assigned representative typically informs the substitute of the surgeon's protocols and preferences to ensure the best possible service. This preserves the loyalty and trust that the assigned representative has cultivated with the surgeon.

Both managers and representatives sign non-compete agreements prohibiting "direct or indirect" competition with Stryker. For example, the agreements prohibit them from inducing Stryker's employees to resign or soliciting Stryker's customers, both during their employment with Stryker and for one year thereafter.[3] Stryker maintains that these agreements protect it from its competitors, like Zimmer, which also use representatives to sell spine-related products.

In December 2010, Zimmer had virtually no market presence in Las Vegas or Arizona. Kevin Brothen, Zimmer's Area Director for the West and a former Stryker manager, developed plans to acquire all but one of Stryker's branch managers, sales managers, and sales representatives in Arizona and Las Vegas. These plans were called Project Sun Devil and Project Viva, respectively. Brothen began by contacting Stryker's

---

[3] Some of the agreements vary in what they expressly prohibit. For example, managers' agreements prohibit them from competing in their former "Sales and Marketing Regions," while representatives' agreements prohibit them from soliciting business from Stryker's "customers" whom they "had contact with or serviced, directly or indirectly" in their respective sales territories.

5

Las Vegas branch manager (Fallon) and its Arizona branch manager (Loughran), both of whom gave him compensation data and sales information. Brothen used this information to calculate what he would offer Stryker employees to induce them to join Zimmer.

Brothen devised a "flip-flopping" scheme to facilitate the employees' compliance with their non-compete agreements while still working for Zimmer. Pursuant to this scheme, Fallon would manage Zimmer's Arizona branch, while Loughran would manage its Las Vegas branch. Sales representatives would remain in their respective branches but would service different customers. This scheme was feasible because of Stryker representatives' personal familiarity with each other's customers.

Around this time, Giebelhaus, a representative in Stryker's Chicago branch, also spoke to Zimmer about defecting from Stryker. Giebelhaus received permission to bring along two other representatives, William Williams and Brian Miller. As in Projects Sun Devil and Viva, the plan was for all three to "flip-flop" sales territories to avoid violating their non-compete agreements.

Brothen's plans were so successful that on March 21, 2011, eleven employees resigned *en masse* from Stryker's Arizona and Las Vegas branches.[4] In Chicago, however, only Giebelhaus resigned.

---

[4] Three employees ultimately changed their minds and decided to stay with Stryker. The eight who did not return are the Individual Defendants in this case.

6

On April 1, 2011, Stryker filed a complaint, along with a motion for a temporary restraining order and preliminary injunction, in the United States District Court for the District of New Jersey, alleging breach of contract and several business torts. The District Court issued a temporary restraining order that same day. A preliminary injunction hearing followed, and on May 13, 2011, the Court issued an oral opinion and entered a written order granting a preliminary injunction. The Individual and Zimmer Defendants both filed timely appeals, which we have consolidated for review.

II[5]

A preliminary injunction may be issued if "'(1) the plaintiff is likely to succeed on the merits; (2) denial will result in irreparable harm to the plaintiff; (3) granting the injunction will not result in irreparable harm to the defendant; and (4) granting the injunction is in the public interest.'" *P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005) (quoting *NutraSweet Co. v. Vit-Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999)). "[W]e exercise plenary review over the district court's conclusions of law and its application of law to the facts, but review its findings of fact for clear error." *Id.* (citing *Duraco Prods., Inc. v. Joy Plastic Enters., Ltd.*, 40 F.3d 1431, 1438 (3d Cir. 1994)). We review the grant of a preliminary

---

[5] The District Court had jurisdiction pursuant to 28 U.S.C. § 1332, and we have jurisdiction under 28 U.S.C. § 1292(a)(1).

7

injunction for abuse of discretion. *E.g.*, *Stilp v. Contino*, 613 F.3d 405, 409 n.3 (3d Cir. 2010).

## III

The District Court applied the proper test in concluding that Stryker was entitled to a preliminary injunction. First, the Court determined that Stryker was likely to succeed on the merits of its breach of contract and tort claims under New Jersey law because the record revealed solicitations of both its employees and customers in violation of its non-compete agreements with the intent to "decimate" its Arizona and Las Vegas operations.[6] The Court also concluded that Stryker would be irreparably harmed without an injunction because it stood to lose nearly all of its customer relationships and goodwill in Arizona and Las Vegas. By contrast, the Individual Defendants had been indemnified and were guaranteed contracts with Zimmer. And although Zimmer stood to lose the value of its customer relationships, the Court noted that such an injury could be discounted because Zimmer likely was at fault. Finally, the Court determined that the public interest in

---

[6] The Individual Defendants argue that New Jersey's "economic loss doctrine" bars Stryker's tort claims. By contrast, the Zimmer Defendants argue that New Jersey law does not apply and that the District Court should have analyzed Stryker's tort claims under Arizona or Nevada law. Both of these arguments have been waived because they were not raised below. *See, e.g.*, *Srein v. Frankford Trust Co.*, 323 F.3d 214, 224 n.8 (3d Cir. 2003) ("We have consistently held that we will not consider issues that are raised for the first time on appeal absent 'compelling reasons.'" (quoting *Patterson v. Cuyler*, 729 F.2d 925, 929 (3d Cir. 1984))).

8

enforcing non-compete agreements and in promoting lawful competition supported an injunction.

Although we largely agree with the District Court's thorough analysis, we hold that portions of the injunction are overbroad. Accordingly, we will affirm in part and vacate in part the order granting a preliminary injunction and remand for proceedings consistent with this opinion.

A

We begin by holding that the injunction must be vacated as to Graveline, Giebelhaus, Rowan, and Poulemanos. "In an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). This requirement is not "hypertechnical." *Prof'l Plan Examiners of N.J., Inc. v. Lefante*, 750 F.2d 282, 289 (3d Cir. 1984). "[T]he judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail." Fed. R. Civ. P. 52(a) advisory committee's note (1946). But if "the record does not provide a sufficient basis to ascertain the legal and factual grounds for issuing the injunction or if the findings are inadequate," the injunction cannot stand. *Educ. Testing Servs. v. Katzman*, 793 F.2d 533, 537 (3d Cir. 1986) (quoting *Lefante*, 750 F.2d at 289).

The District Court made ample factual findings with respect to six of the Individual Defendants: Hermansky, Hilton, Burciaga, Lively, Fallon, and Loughran. The Court did not, however, explain why it enjoined Rowan or Poulemanos. Though the Court suggested that they resigned from Stryker and planned to participate in the "flip-flopping" scheme, it did not cite any evidence that they actually breached their non-compete agreements or acted tortiously. Absent specific findings of fact, the injunction against Rowan and Poulemanos cannot stand.

As for Graveline and Giebelhaus, the District Court did not discuss either Defendant until after reading its order into the record, which prompted their counsel to ask whether they were included in the injunction. The Court then simply noted that it was "very reluctant to unhitch them from the corporate entity . . . and the individuals that are part of it." Because the Court made no factual findings as to how Graveline or Giebelhaus engaged in tortious activity, the injunction was not proper as to them as well.

## B

Defendants argue that the injunction is overbroad. We agree, but only with respect to paragraphs A and F of the injunction.

"District courts are afforded considerable discretion in framing injunctions," but "'injunctive relief should be no broader than necessary to provide full relief to the

10

aggrieved party.'" *Meyer v. CUNA Mut. Ins. Soc'y*, 648 F.3d 154, 169–70 (3d Cir. 2011) (quoting *Ameron, Inc. v. U.S. Army Corps of Eng'rs*, 787 F.2d 875, 888 (3d Cir. 1986)).

> Paragraph A states:
>
> Defendants, and all parties in active concert or participation with them, are preliminarily enjoined from soliciting or moving the business of any current Stryker Spine customer of the Las Vegas and Arizona Branches, defined as any physician who was serviced by any of the Stryker employees who were solicited and acquired by Zimmer under Project Sun Devil and Project Viva, to Zimmer, for a period of 12 months, effective April 1, 2011[.]

We are concerned that the phrase "moving the business" might be read to completely preclude Stryker's customers in Arizona and Las Vegas from using Zimmer products, even when they have not been solicited by Defendants. In such cases, Stryker's business would be "moving" only because of fair competition. Restricting such competition would go beyond restoring the status quo as it existed before Projects Sun Devil and Viva, when Zimmer was free to service Stryker customers so long as it did so fairly. Insofar as the injunction now prohibits Zimmer from competing fairly, the injunction is overbroad.[7]

---

[7] The District Court expressed concern that trying to return to the status quo would present a "problem in terms of capitalism and free competition" because the Individual Defendants already may have severed Stryker's customer relationships by soliciting surgeons in Arizona and Las Vegas. We agree that this is a valid concern, but Stryker can seek damages for business that was "moved" tortiously or in violation of non-compete agreements.

We also agree with Defendants that Paragraph F is overbroad. That paragraph states:

> Defendants, and all parties in active concert or participation with them, are preliminarily enjoined from soliciting, inducing or influencing, or attempting to solicit, induce or influence, any person engaged as an employee, independent contractor or agent of Stryker to terminate his, her or its employment and/or business relationship with Stryker[.]

Paragraph F reasonably prohibits Defendants from soliciting Stryker's branch managers, sales managers, and sales representatives in Las Vegas and Arizona to terminate their employment. But it also precludes them from soliciting *any* Stryker employees, independent contractors, and agents in *any* Stryker branch. The District Court made no findings to support such a broad injunction. Though the District Court found that some of Stryker's Chicago employees were solicited, it concluded that Stryker had not shown any irreparable harm there. No findings were made with respect to any other Stryker office outside of Las Vegas and Arizona, and there were no findings of fact relating to independent contractors or agents. Paragraph F must be circumscribed accordingly.

## C

Finally, we consider Defendants' argument that the District Court erred by not establishing an injunction bond as required by Rule 65 of the Federal Rules of Civil Procedure. "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to

pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).  The bond "serves to inform the plaintiff of the price they [sic] can expect to pay if the injunction was wrongfully issued." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 804–05 (3d Cir. 1989).  The amount of the bond is left to the district court's discretion. *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 426 (3d Cir. 2010).

The District Court set the bond at $800,000 to secure the temporary restraining order but declined to require the posting of a new bond at the preliminary injunction hearing, reasoning:

> We are recreating in this 12 month period a time during which Zimmer[,] had it played fair according to the testimony shown in the prima facie showing . . . would have trained its own fleet.  It has already trained people[,] which puts it [ahead] of the game.  And what we're saying is, they are not going to go into action now.  There's no loss that I see.

The Individual Defendants have been indemnified and guaranteed salaries, so they bear no financial risk if they are wrongfully enjoined.  But concluding that the Zimmer Defendants bear no risk of loss assumes that Projects Sun Devil and Viva were improper and that the Zimmer Defendants were properly enjoined.  The purpose of the bond requirement is to protect the enjoined party in the event the injunction should not have been imposed.  Accordingly, the District Court must impose a new bond after considering what is necessary to protect Zimmer in the event the injunction is later deemed unlawful.

13

We express no opinion as to the value of such a bond and leave that decision to the sound discretion of the District Court following a full hearing on the issue.

IV

For the reasons stated, we will affirm in part and vacate in part the District Court's order granting a preliminary injunction and remand the matter for further proceedings consistent with this opinion.