TALLMAN, Circuit Judge, with whom Judges RYMER and KLEINFELD join,
dissenting:
The Supreme Court has repeatedly told us to adhere to the highly deferential standard of review of state court judgments that the Antiterrorism and Effective Death Penalty Act (“AEDPA”), 28 U.S.C. § 2254(d), requires in federal habeas cases. But my colleagues continue to treat this case as if it were on direct appeal to be reviewed de novo. The majority will not yield to the shot across our bow fired by the Supreme Court when it granted Arizona’s petition for certiorari and vacated and remanded our original en banc decision for reconsideration in light of Florida v. Powell, — U.S.-, 130 S.Ct. 1195, 175 L.Ed.2d 1009 (2010) — a case that reaffirms the Court’s precedent under which the Arizona Court of Appeals’ decision upholding Doody’s confession reasonably fits. See Ryan v. Doody, — U.S. -, 131 S.Ct. 456, 178 L.Ed.2d 282 (Oct. 12, 2010) (Mem.). Subsequently, the Court fired a torpedo amidships in Harrington v. Richter, — U.S.-, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011). But the majority steams defiantly ahead, far from the rest of the fleet. I respectfully dissent.
Virtually ignored by my colleagues in the majority is the fact that Arizona conducted a ten-day evidentiary hearing and a thirty-four day trial. Four judges and twelve jurors thoroughly reviewed all of the circumstances surrounding Doody’s interrogation. All concluded that his confession was voluntary. AEDPA obligates us to affirm this conclusion unless it was objectively unreasonable. 28 U.S.C. § 2254(d). The majority nonetheless parses the record and re-weighs the evidence to reach what is effectively a de novo determination — and then strikes down the Arizona court’s decision when it arrives at a different result.
The Supreme Court recently chastised us again for doing this. Richter, 131 S.Ct. at 785(“The[Ninth Circuit] Court of Appeals’ lengthy opinion ... discloses an improper understanding of § 2254(d)’s unreasonableness standard.... A state court must be granted a deference and latitude that are not in operation [on direct re *1030 view].”); see also McDaniel v. Brown, — U.S.-, 130 S.Ct. 665, 673, 175 L.Ed.2d 582 (2010) (“[T]he[Ninth Circuit] Court of Appeals’ discussion of the ... evidence departed from the deferential review that ... § 2254(d)(1) demand[s].”); Knowles v. Mirzayance, 556 U.S. 111, 129 S.Ct. 1411, 1419-20, 173 L.Ed.2d 251 (2009) (“The [Ninth Circuit] Court of Appeals reached [the wrong] result based, in large measure, on its application of an improper standard of review.... The question is not whether a federal court believes the state court’s determination ... was incorrect but whether that determination was unreasonable — a substantially higher threshold.”) (internal quotation marks omitted); Waddington v. Sarausad, 555 U.S. 179, 129 S.Ct. 823, 833, 172 L.Ed.2d 532 (2009) (“The reasoning of the [Ninth Circuit] Court of Appeals ... failed to review the state courts’ resolution of this question through the deferential lens of AED-PA[.]”); Uttecht v. Brown, 551 U.S. 1, 10, 127 S.Ct. 2218, 167 L.Ed.2d 1014 (2007) (“The requirements of [AEDPA], of course, provide additional, and binding, directions to accord deference.... By not according the required deference, the [Ninth Circuit] Court of Appeals failed to respect the limited role of federal habeas relief in this area prescribed by Congress and by our cases.”); Schriro v. Landrigan, 550 U.S. 465, 475-80, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007); Carey v. Musladin, 549 U.S. 70, 76-77, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006); Woodford v. Visciotti, 537 U.S. 19, 25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (“An ‘unreasonable application of federal law is different from an incorrect application of federal law.’ The Ninth Circuit did not observe this distinction, but ultimately substituted its own judgment for that of the state court, in contravention of 28 U.S.C. § 2254(d).”) (citation omitted).
But we are unrepentant. I recognize that some of my colleagues would have decided this case differently than the Arizona state courts did. But “[i]t bears repeating that even a strong case for relief does not mean the state court’s contrary conclusion was unreasonable.”[1] Richter, 131 S.Ct. at 786.
The Arizona court’s factual determinations were not unreasonable, nor did its legal conclusions contravene controlling Supreme Court precedent. We should affirm the dismissal of Doody’s habeas petition.
I
A
In August 1991, Phoenix, Arizona, was rocked by nine brutal murders at a Buddhist temple. State v. Doody, 187 Ariz. *1031 863, 930 P.2d 440, 443 (Ariz.Ct.App.1996). The crime scene was pure carnage. “The victims, including six Buddhist monks, lay face down in a circle, each shot execution-style in the head. Several of the victims had sustained additional, non-fatal shotgun wounds. Living quarters inside the temple had been ransacked, and items of personal property, including money, cameras, and stereo equipment, were missing.” Id. A massive investigation followed.
Prosecutors initially charged four men from Tucson, Arizona, with the murders. Id. Then, during a routine traffic stop on Luke Air Force Base near Phoenix, police found the .22 caliber rifle used to shoot the victims. Id. The owner of the rifle, Rolando Caratachea, denied any involvement in the murders, but said that his roommate, Jonathan Doody, and a friend, Alessandro Garcia, “had borrowed the rifle shortly before the murders.” Id. at 444.
At that time, Doody was seventeen-and-one-half years old. He was born in Thailand but moved to the United States as a child with his American stepfather, who was in the Air Force, and his Thai mother. His mother and brother were members of the temple where the murders occurred, and his brother had been a novice monk there. Doody visited the temple when his brother was there. Doody spoke fluent but lightly accented English. He was a junior in high school, “maintained a B grade average,” was commander of the junior Reserve Officers’ Training Corps Honor Guard and Color Guard, and worked at the Luke Air Force Base commissary. Id. at 445-46. Emancipated from his parents, who had moved to Colorado, Doody lived in an apartment in Arizona with Caratachea and another friend.
Based on the scope of the crime — which required controlling nine victims while ransacking the temple and then methodically executing them — the police deduced that several people were involved. Maricopa County Sheriffs detectives located Doody, dressed in his ROTC uniform, at a high school football game on a Friday night. Id. at 443-44. Detective Riley, who had spoken with Doody earlier in the investigation, explained there were now some additional questions about Caratachea’s rifle and asked if Doody was willing to come to the Sheriffs office. Doody assented and climbed into the detective’s car.
When they arrived, Doody was placed in what had been the office of a deputy Maricopa County attorney rather than an interrogation room. An officer started a tape recorder. Athough Doody was not yet a suspect, Detective Riley nonetheless advised him of his Miranda rights. Riley read each warning from the standard juvenile Miranda form, which he gave Doody to follow along. The written text that Doody simultaneously read and initialed appears in the attached Appendix. The Miranda form’s very last admonition, separated from the numbered warnings, states, “If you want to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.” Doody indicated, by initialing the document, that he understood this right, too. At no time did he stop the questioning or ask for a lawyer.
In addition to the printed text, Riley offered some explanation of each right. He paused after each one while Doody indicated he understood the printed right and initialed it on the form. Riley also told Doody several times that if he had any questions, he should feel free to ask. Doody declined to have a parent or attorney present and clearly expressed that he was willing to talk with the officers.
Detective Riley began the interrogation around 9:25 p.m. by questioning Doody *1032 about his roommate’s rifle. “Doody initially denied any knowledge of the events at the temple but, after two and one-half hours, made inculpatory statements and, after approximately four more hours of questioning, admitted to being at the temple on the night of the murders.” Id. at 444. Based on these incriminating admissions, the officers continued their questioning and Doody slowly became more forthcoming.
The interrogation ultimately lasted nearly thirteen hours. Over the course of the interrogation, Doody admitted he helped plan the assault on the temple with others, including Garcia. He recounted, “We borrowed the rifle ... to see if we [could] make a silencer.... ” Tape 11, p. 25. He answered “Yes” to the question “Were you going to use the silencer in the temple?” Id. He said they “drove past the place twice.” Id. at p. 3. It was “just going to be a joke and it just went downhill. We entered the temple, one through each door. Everything was done in clockwork....” Tape 10, p. 8. “We ... searched the place for any security.” Id. at p. 12. “They were laying down ... face down.” Id. at p. 14. “And then I guess, I don’t know, somebody panicked or something, and started firing and then constant .22 fire.” Tape 15, p. 13. “We ran out. Got into a car. We just took off.” Tape 10, p. 14.
Doody claimed they originally intended only to conduct a “war game” to see if they could surround the building without setting off the security system, but his co-conspirators then ransacked the living-quarters and gathered the victims. Doody maintained that someone else suggested they eliminate the witnesses after one of the monks recognized an accomplice, and that Doody was sent outside the building to determine whether anyone could hear shots from inside when the nine killings occurred. Garcia, who was being separately questioned the same night, said it was Doody who insisted they “leave no witnesses,” and Doody who pulled the trigger.
B
Based on their interlocking confessions and evidence which corroborated those confessions, Doody and Garcia were charged with robbery and murder. Early in pretrial proceedings, Doody moved to suppress his confession.[2] The trial court conducted an exhaustive evidentiary hearing, lasting ten days, to determine whether Doody’s confession was voluntary. The officers who questioned Doody all testified, and the court heard all thirteen hours of audio tape from the interrogation. Doody did not take the stand to contradict the officers. The written Miranda warnings Doody read and acknowledged were admitted into evidence. The court considered all of the relevant circumstances, credited the testimony of the detectives as to Doody’s demeanor, and concluded from the totality of the evidence presented that Doody confessed voluntarily, after knowingly and intelligently waiving his constitutional rights. Doody, 930 P.2d at 445.
Doody proceeded to trial, which lasted thirty-four days. The jury heard all thirteen hours of Doody’s interrogation as well as other corroborating evidence linking him to the crime. That evidence included incriminating statements Doody made to friends after the murders, his fingerprints located on loot taken from the temple, the fact that he made a substantial cash down payment to purchase a car shortly after *1033 the crime (during which $2,650 in cash was taken), and Garcia’s accomplice testimony. The jury was instructed that Doody’s statement was not voluntary if it resulted from his “will being overcome by a law enforcement officer’s use of any sort of violence, coercion, or threats, or by any direct or implied promise, however slight.” Id. at 448.
The jury obviously found none, because it convicted Doody on every count. The jury held Doody liable for the nine murders on a theory of felony murder rather than premeditated murder. The trial court sentenced Doody to nine consecutive life terms for the murders and eleven additional prison terms on the remaining felony counts.
Doody appealed his convictions, arguing, inter alia, that the trial court erred in failing to suppress his confession. He claimed the totality of the circumstances rendered the confession involuntary and that the Miranda warnings were inadequate. The Arizona Court of Appeals rejected both arguments in a lengthy reasoned opinion. See State v. Doody, 187 Ariz. 363, 930 P.2d 440, 443 (Ariz.Ct.App.1996). It considered all of the circumstances surrounding Doody’s confession, including his age and intelligence, the length of the interrogation, the absence of a parent (even though Doody was fully emancipated), and the tone and tactics employed by the detectives throughout the interrogation. The court concluded the tactics were not unduly oppressive and Doody had confessed voluntarily. Id. at 446-48.
The Arizona Court of Appeals also rejected Doody’s argument that the warnings were inadequate. Upon review of the audiotape of the warnings, the signed written waiver, and the interrogating officers’ testimony regarding Doody’s demeanor, the court found “the officers explained [Doody’s] rights in a manner appropriate for his age and apparent intelligence.” Id. at 449. The court affirmed Doody’s convictions.
The Supreme Court of Arizona denied review, and the Supreme Court of the United States denied Doody’s petition for a writ of certiorari. The United States District Court for the District of Arizona denied Doody’s subsequent federal habeas petition. A three-judge panel of our court, including two members of today’s majority, reversed, holding the Arizona Court of Appeals was not objectively unreasonable in concluding the Miranda warnings were adequate, but ruling that Doody’s confession was nonetheless involuntary because the interrogation lasted too long. The panel granted habeas relief. See Doody v. Schriro, 548 F.3d 847, 849(9th Cir.2008). We granted rehearing en banc. See Doody v. Schriro, 566 F.3d 839 (9th Cir. 2009).
II
Contrary to the majority’s penchant for unrestricted reconsideration, the “elephant in the courtroom” here is the standard of review. Wong v. Belmontes, — U.S. -, 130 S.Ct. 383, 390, 175 L.Ed.2d 328 (2009). Under AEDPA, we may not grant habeas relief unless the state court decision “was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,” or “was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.” 28 U.S.C. § 2254(d). A state court’s decision is an “unreasonable application of ... clearly established law” only if it is “objectively unreasonable.” Williams v. Taylor, 529 U.S. 362, 409, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A federal court may not issue a writ of habeas corpus merely because it concludes “in its independent *1034 judgment” that the state court erred. Id. at 411, 120 S.Ct. 1495.
Nevertheless, the majority reviews the record as though it were the initial finder of fact or reviewing a federal conviction on direct appeal, and, when it arrives at a result that differs from the state court’s, declares the state court to have been “unreasonable.” Cf. Richter, 131 S.Ct. at 786(noting that after conducting a de novo review, the Ninth Circuit “declared, without further explanation, that the ‘state court’s decision to the contrary constituted an unreasonable application of [Supreme Court precedent]’ ”). But “AEDPA demands more. Under § 2254(d), a habeas court must determine what arguments or theories supported or ... could have supported[] the state court’s decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments are inconsistent with the holding in a prior decision of [the Supreme Court].” Id. By failing to make this inquiry, the majority has again “all but ignored the only question that matters under § 2254(d)(1).” Id. (internal quotations and citation omitted). The Doody majority once more pays mere lip service to AED-PA and then proceeds as though it does not exist.
Ill
Doody understood and voluntarily waived his constitutional rights. Miranda v. Arizona requires that prior to custodial questioning, an accused must be “clearly informed” of his rights.' 384 U.S. 436, 471, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). When considering the adequacy of a Miranda advisement, “reviewing courts are not required to examine the words employed ‘as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably convey to a suspect his rights as required by Miranda.’ ” Powell, 130 S.Ct. at 1204 (2010) (quoting Duckworth v. Eagan, 492 U.S. 195, 202, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989)) (internal quotation marks and citation omitted).
The oral delivery of the warnings, which the majority characterizes as a “twelve-page rambling commentary that is in alternating part misleading and unintelligible,” Maj. Opinion at 1007, proceeded as follows while Doody read the written warnings laid before him on the table:
Detective Riley: Ah, what this is, is that ah you have the right to remain silent and ah, and what it states is that this means that you do not have to talk to me or answer any questions about ah, the matter that we’re going to discuss with you, okay. You can be quiet if you, if you wish. Okay, did you understand that?
Doody: Uh-huh.
Detective Riley: Okay, ah, as we go here, they ah, hey ask that you initial ah, here indicating that I read it to you and that you understand it. Ah, so if you could ah, as we go, I will go ahead and just have you initial in the box whether you do or don’t.
Doody: Okay.
Detective Riley: Okay. And the next one is that anything that you say can and will be used against you in a court of law and what this means is that anything that you tell me, I can use later against you in court and a court of law is a place where a judge will decide whether ah, you did something or whether you didn’t do something, okay. And a judge is like an umpire in a baseball game. He decides whether you have acted in a right or wrong way, okay. Ah, if you did something wrong ah you may be punished and if you didn’t you won’t be punished, okay. Do you understand all of that?
Doody: Uh-huh.
*1035 Detective Riley: Okay, if you could just initial there. Okay, and the next one states that you have the right to have an attorney present prior to and during questioning, and what that means is that if you want one, you’re allowed to have a lawyer here before and during you know my questions to you, okay. And then an attorney is a lawyer who will speak for you and help you concerning the crime or any kind of offense that ah we might think that you or somebody else was involved in, if you were involved in it, okay. Again, it [sic] not necessarily mean that you are involved, but if you were, then that’s what that would apply to okay. And do you understand that?
Doody: Yeah.
Detective Riley: Any questions?
Doody: No.
Detective Riley: Okay. Okie doke.
Doody: Oh yeah what’s this for?
Detective Riley: Ah, okay I’ll, again I’m gonna go in and, and explain some things to you. Ah, in the next one states that if you cannot afford an attorney, you’d have the right to have one appointed for you prior to questioning okay, and what this means, is if you do not have the money to get a lawyer ah, if you wished ah, one will be given to you free of charge before any questions and things like that, okay. Do you understand that?
Doody: Uh-huh.
After delivering the Miranda warnings and obtaining Doody’s written confirmation that he understood them, Detective Riley asked Doody if he wished to have a parent or guardian present. Doody said he did not. Detective Riley then asked, “Ah, so you will be willing to talk with us right now?” Doody replied, “Yeah.” Before asking any questions, Detective Riley, still following the written form, again confirmed that Doody was willing to talk without a parent or an attorney present, that he knew he could stop the interrogation “at any time,” and that he understood the warnings:
Detective Riley: And at the bottom here is what it’s saying is that ah, if ah, you have no problem with ah talking to myself and David here right now, with ah, without anybody else present or an attorney, or your parents, or, or anyone ah, then as I said, we have some things we’d like to ask you and we’d like to do that. Ah, and if you have no problem with that, we’d like to talk to you about that. Ah, but if you want to then ah, to stop at any time, that’s something you can do as well. Okay. Do you have any questions at all about any of these things I’ve, I’ve explained to you?
Doody: Ah, No.
Detective Riley: Okay. Do you understand all the things that I have read to you?
Doody: Yes.
Detective Riley: Okay. And all that says here is that you do understand all those, and if you do, if you’ll just initial the right box there. Okay. And again, is there any questions at all Jonathan about, about any of that that I read to you?
Doody: No, no.
Following its ten-day pre-trial evidentiary hearing, the Maricopa County Superior Court ruled these warnings were adequate. The Arizona Court of Appeals affirmed the trial court and concluded, in language echoing the post -Miranda legal standard articulated by Arizona caselaw, that the warnings were delivered “in a clear and understandable manner ... appropriate for [Doody’s] age and apparent intelligence.” Doody, 930 P.2d at 448-49 (citing State v. Mumbaugh, 107 Ariz. 589, 491 P.2d 443, 451 (1971), for the requirement that the officers must have “imparted a clear, understandable warning of all *1036 defendant’s rights ... in language the defendant could comprehend and on which he could intelligently act”). This conclusion fits reasonably within the bounds of federal law as determined by the Supreme Court as to what constitutes a sufficiently “clear” Miranda warning. My colleagues disagree and assert that there is no possibility that a fairminded jurist could conclude otherwise. Maj. Opinion at 1006- 07.
While the Supreme Court has not decided a case with facts “materially indistinguishable” from the facts before us, Williams, 529 U.S. at 406, 120 S.Ct. 1495, it has certainly instructed us as to how to approach our adequacy analysis. The Supreme Court has never insisted that Miranda warnings be given verbatim as set forth in that opinion. Duckworth, 492 U.S. at 202, 109 S.Ct. 2875. Indeed, the Court has repeatedly cautioned against rigid requirements as to the form of Miranda warnings. See id.; California v. Prysock, 453 U.S. 355, 359, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981). It has done so once again in Powell, which reiterates that, while “[t]he four warnings Miranda requires are invariable” — including “the right to consult with a lawyer and to have the lawyer [present] during interrogation,” — the Supreme Court “has not dictated the words in which the essential information must be conveyed.” 130 S.Ct. at 1203-04(internal quotations and citations omitted). The longstanding test is simply whether the words that are used “reasonably convey” the four crucial rights. Id. at 1204 (quoting Duckworth, 492 U.S. at 203, 109 S.Ct. 2875).
In Powell, the Supreme Court held that an officer’s statements to a suspect that “You have a right to talk to a lawyer before answering any of our questions” and “You have the right to use any of these rights at any time you want during this interview,” reasonably conveyed the suspect’s right to counsel. Id. at 1199-1200, 1205. Even though the officer never explicitly stated that the right to counsel applied not only before, but during, questioning, the Court found that the warnings, while not “the clearest possible formulation ... were sufficiently comprehensive and comprehensible when given a commonsense reading.” Id. at 1205.
Powell thus echoed Prysock, in which the Supreme Court upheld warnings that advised a suspect of his right to have a lawyer present prior to and during questioning, and to have a lawyer appointed “at no cost to yourself,” but not expressly to his right to have the appointed lawyer present prior to and during questioning. 453 U.S. at 356-57, 101 S.Ct. 2806. The Court held that the warnings nonetheless “fully conveyed” the rights spelled out in Miranda, which did not require a “talismanic incantation ... to satisfy its strictures.” Id. at 359, 361, 101 S.Ct. 2806.
Powell also cited to Duckworth, which is more analogous to Doody’s case. See Powell, 130 S.Ct. at 1204. In Duckworth, the Supreme Court upheld a warning even when it was accompanied by an arguably misleading elaboration. There, the police read the suspect his rights from a form that he later signed which provided in part: “You have [the] right to the advice and presence of a lawyer even if you cannot afford to hire one. We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you go to court.” Duckworth, 492 U.S. at 198, 109 S.Ct. 2875 (original emphasis). The Seventh Circuit rejected the warnings, finding that the “if and when you go to court” language could be understood to negate a suspect’s right to appointed counsel before and during the impending interview: “The entire warning is therefore, at best, misleading and confusing and, at worst, constitutes a subtle temptation to the unsophisticated, indigent accused to *1037 forego the right to counsel at this critical moment.” Eagan v. Duckworth, 843 F.2d 1554, 1557 (7th Cir.1988).
The Supreme Court, however, reversed and held that the warnings “in their totality” were adequate. Duckworth, 492 U.S. at 205, 109 S.Ct. 2875. It noted that officers may “inadvertently depart from routine practice” when offering elaborations for the benefit of a suspect, and that reviewing courts should therefore not examine the language used “as if construing a will or defining the terms of an easement.” Id. at 203, 109 S.Ct. 2875. Notwithstanding the potential false implication of the elaborating language, the Court found that the warnings had “touched all of the bases required by Miranda ”: the police told the suspect of his right to remain silent, that anything he said could be used against him in court, that he had a right to an attorney before and during questioning, and that he had the right to an attorney even if he could not afford to hire one. Id.
My colleagues are correct that Powell does not materially change the analysis we must apply to the case at hand: it reaffirms the two prior Supreme Court cases, Prysock and Duckworth, that establish the federal law demonstrating why the Arizona Court of Appeals’ decision is reasonable. Those two cases stand for the following general principles: first, that deviation from a formulaic Miranda script is tolerated so long as a suspect’s rights are “reasonably conveyed”; and second, that elaborating language — even if it is misleading — is not necessarily fatal to a Miranda warning if the warnings “in their totality” communicate the four basic rights. Undaunted, my colleagues persist in declaring that the Arizona Court of Appeals was not only wrong, but objectively unreasonable, when it decided that the warnings given to Doody, which including an ambiguous oral elaboration on the meaning of the word “attorney,” but which otherwise tracked the printed form simultaneously read and "initialed by Doody that properly articulated his rights, were constitutionally adequate. According to the majority, “whatever the applicable standard for reviewing the state court decision, the violation of Doody’s rights in this case is so absolutely clear as to compel that the Writ be granted.” Maj. Opinion at 1007.
My colleagues rest their conclusion on Detective Riley’s deviation from an accurate reading of the Miranda form, his allegedly misleading explanation of the right to counsel, and his alleged downplaying of the significance of the Miranda warnings. Were we reviewing this case on direct appeal, each of these might be legitimate grounds for debate. However, to interpret these portions of the record de novo, without any regard for the state courts’ careful determinations of fact or applications of law under controlling Supreme Court precedent, ignores AEDPA.[3]
*1038 The majority insists that if we properly apply AEDPA, we are actually succumbing to a “temptation to abdicate our responsibility on habeas review,” and colorfully concludes that, if we follow the statute, “we might as well get ourselves a big, fat rubber stamp, pucker up, and kiss The Great Writ good-bye.” Maj. Opinion at 1003. It is true, of course, that we must be “vigilant and independent in reviewing petitions for the writ.” Richter, 131 S.Ct. at 780. However, “confidence in the writ and the law it vindicates [is] undermined[ ] if there is judicial disregard for the sound and established principles that inform its proper issuance.” Id. Our responsibility on collateral habeas review under AEDPA is not to ask how we see the evidence— which is what the majority does — but to ask whether how the state courts viewed the evidence is objectively unreasonable under clearly established federal law. In this task we have neither a rubber stamp nor an eraser, just a nuanced duty to recognize the distinct role of both state and federal courts on habeas review. See id. at 787(“Section 2254(d) is part of the basic structure of federal habeas jurisdiction, designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions.”).
It’s called comity — a binding constitutional concept which the Supreme Court has all too often reminded us we must respect when it has reversed our AEDPA decisions. See, e.g., id. at 14 ([The Ninth Circuit’s] analysis illustrates a lack of deference to the state court’s determination and an improper intervention in state criminal processes, contrary to the purpose and mandate of AEDPA and to the now well-settled meaning and function of habeas corpus in the federal system.”); Woodford, 537 U.S. at 24, 123 S.Ct. 357 (per curiam) (noting that our “readiness to attribute error is inconsistent with the presumption that state courts know and follow the law” and inconsistent with AEDPA, “which demands that state court decisions be given the benefit of the doubt”).
If the majority thinks that AEDPA’s unreasonableness standard, properly applied, is a difficult one for petitioners to meet, “that is because it was meant to be.” Richter, 131 S.Ct. at 786. AEDPA
preserves authority to issue the writ in cases where there is no possibility fair-minded jurists could disagree that the state court’s decision conflicts with [Supreme Court] precedent. It goes no further. Section 2254(d) reflects the view that habeas corpus is a ‘guard against extreme malfunctions in the state criminal justice systems,’ not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus, a state prisoner must show that the state court’s ruling on the claim ... was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement.
Id. (quoting Jackson v. Virginia, 443 U.S. 307, 332 n. 5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).
Our duty in this case is therefore simply to ask whether there is any possibility that fairminded jurists could disagree that the Arizona Court of Appeals’ decision contravened then-available Supreme Court precedent. In Prysock and Duckworth, and now again in Powell, the Supreme Court has explicitly and repeatedly condoned deviations from a formulaic Miranda script. Duckworth further allows for additional and even misleading elaborating statements that “inadvertently depart from routine practice.” 492 U.S. at 203, 109 S.Ct. 2875. Fair-minded jurists could conclude that this precedent permits a less-than-accurate oral recitation and explanation of a valid printed Miranda form that a sus *1039 pect is given to read. (The original three-judge panel in this case, including two members of the en banc majority, found that it did the first time around. Doody, 548 F.3d at 863.) The decision of the Arizona Court of Appeals was therefore not unreasonable if AEDPA is properly applied.
Detective Riley’s oral Miranda delivery is not a model of English diction. However, especially when considered together with the written warnings form, it does touch all of Miranda’s bases: the four essential components are easily identifiable, and nearly all of the additional material clarifies, rather than obfuscates. The oral warnings are even clearer when heard on the audio tape, rather than read as printed snippets in the majority’s opinion. The colloquial filler (“ah,” “like,” “and things,” “okay,” etc.), which is distracting on the page, is largely filtered out when heard by the average listener. Even those of us who spend our days striking every unnecessary word from our written work commonly make, and hear, statements of less than perfect prose. We are nonetheless able to communicate and understand serious ideas. Moreover, the written warnings, which lacked colloquial filler or lengthy elaboration, were simultaneously set before Doody and expressly acknowledged by him. See Appendix. It was not unreasonable for the Arizona Court of Appeals to conclude that the combination of written and spoken warnings reasonably conveyed the essential rights to a young, emancipated man like Doody.
Nor was it unreasonable to conclude that Detective Riley’s elaboration on the definition of “attorney” did not fatally obscure the fundamental import of the right to counsel during interrogation. My colleagues complain that his ambiguous explanation could be construed to suggest that one only has a right to an attorney if he is guilty. True. It could be construed that way, just like the explanation that a lawyer would be appointed “if and when you go to court” in Duckworth, even if technically correct, could have been construed by a suspect to suggest that he only had the right to an attorney before or during questioning if he could afford to hire his own. Duckworth nonetheless held that the warnings in that case “in their totality, satisfied Miranda.” 492 U.S. at 205, 109 S.Ct. 2875.
Duckworth addressed different facts from the ones before us, but it was not objectively unreasonable for the Arizona Court of Appeals to conclude the “circumstances in their totality” counseled the same result here. Doody, 930 P.2d at 443. While part of Detective Riley’s explanation may have been ambiguous, the four essential Miranda warnings themselves were stated correctly, and Doody was simultaneously looking at a written form that clearly laid out the warnings without any problematic elaboration. See Appendix. Doody’s receipt and acknowledgment of the written warnings, which no one claims were incorrect, could certainly have alleviated any ambiguity or misinterpretation.
To make the argument that the warnings given to Doody did not satisfy Miranda, the Chief Judge’s concurring opinion approaches the record de novo and asks us to imagine that Detective Riley’s spoken words were printed on a state-produced form and given to Doody to initial. See Concurrence at 1026-27. But, even if we were on direct review, and even assuming that Detective Riley’s spoken words would be insufficient if presented on a printed form, that does not decide this case because that is not the test we apply. We do not reduce all that is spoken into writing in order to “examine the words employed as if construing a will or defining the terms of an easement.” Powell, 130 S.Ct. at 1204. Instead, we assess Mi *1040 randa warnings “in their totality” and “in context.” Id. at 1204, 1205. Thus, just as we should not isolate and emphasize only one component of a warning, see id. at 1204, we should not isolate Detective Riley’s passing oral explanations and give them unnatural emphasis through the imprimatur of an official form. After all, the concurrence’s reliance on this hypothetical only helps make the point that printed words often carry more import than passing speech.
What should instead be done to properly assess the warnings given to Doody “in their totality” and “in context” is exactly what the state trial court did when, in the course of an extensive evidentiary hearing, it heard the audio tape of the warnings, saw the juvenile Miranda form with Doody’s initials, and listened to the administering officers testify that Doody “exhibited no signs of doubt or confusion.” Doody, 930 P.2d at 449. The Arizona courts then concluded the warnings were adequate. Id. Because we are on habeas review, we must accord AEDPA deference to that conclusion by asking whether it could be supported by theories that are not inconsistent with Supreme Court precedent, rather than engaging in a de novo analysis and comparing the results. See Richter, 131 S.Ct. at 786. Under Duck-worth, a state court could reasonably conclude that the effect of the combined oral and written warnings was to “toueh[ ] all of the bases required by Miranda,” and “reasonably convey” to Doody his rights. 492 U.S. at 203, 109 S.Ct. 2875. This is especially so since the Supreme Court has not indicated what effect simultaneously acknowledged written warnings might have when the oral warnings are unclear. Although the Chief Judge declares that “it would be unreasonable” to conclude that the combined warnings were adequate, Concurrence at 5851, without Supreme Court precedent on point, “it cannot be said that the state court ‘unreasonably] appli[ed] clearly established Federal law.’ ” See Musladin, 549 U.S. at 77, 127 S.Ct. 649 (quoting 28 U.S.C. § 2254(d)(1)).
Finally, the majority faults the Arizona Court of Appeals for failing to conclude that Detective Riley’s Miranda delivery, because it offered “repeated assurances” to Doody and was long-winded, impermissibly downplayed the significance of the warnings. Maj. Opinion at 1002-03. Certainly, Miranda establishes the general proposition that the warnings should serve “to make the individual more acutely aware that he is faced with a phase of the adversary system — that he is not in the presence of persons acting solely in his interest.” Miranda, 384 U.S. at 469, 86 S.Ct. 1602. However, contrary to the majority’s suggestion, there is no Supreme Court precedent that should have compelled the Arizona Court of Appeals to conclude that the detective’s verbosity or “good cop” demeanor violated this general rule. And “it is not an unreasonable application of clearly established federal law for a state court to decline to apply a specific rule that has not been squarely established by [the Supreme Court].” Knowles, 129 S.Ct. at 1419; see also Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) (“The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.”).
It was not unreasonable for the Arizona court to conclude from the totality of the circumstances that Doody was aware of the gravity of his situation. What Doody characterizes as “reassuring patter” intentionally designed to “obscure and downplay” the importance of the warnings can be reasonably interpreted as explanation designed to focus Doody’s attention on what was being said. Although the explanations and tone were calibrated to put Doody at ease, Detective Riley did not *1041 joke or make light of the warnings. Cf. Cooper v. Dupnik, 963 F.2d 1220, 1228-29 (9th Cir.1992) (en banc), overruled on other grounds by Chavez v. Martinez, 538 U.S. 760, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003). Doody knew from the moment he got into the police car that the officers intended to question him about the murder weapon. Detective Riley clearly told Doody “anything that you tell me I can use later against you in court,” and told him a judge would decide whether he had done something wrong, and if so, that he would be punished. Doody was therefore “aware not only of the privilege, but also of the consequences of forgoing it.” Miranda, 384 U.S. at 469, 86 S.Ct. 1602.
The Arizona Court of Appeals’ conclusion that the spoken and written Miranda warnings delivered to Doody were sufficient was not an objectively unreasonable application of federal law as established by Miranda, Prysock, and Duckworth, and as recently reiterated by Powell. The majority’s contrary conclusion rests on its de novo interpretation of the record and total disregard for the state courts’ factual findings and reasoned legal conclusions, in contravention of AEDPA.
IV
Whether Miranda warnings were adequate and whether a confession was voluntary are closely related inquiries. “[F]ailure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained. Conversely, giving the warnings and getting a waiver has generally produced a virtual ticket of admissibility.” Missouri v. Seibert, 542 U.S. 600, 608-09, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004) (plurality opinion) (footnote omitted). Because I would conclude the warnings were adequate, I proceed to consider the other circumstances relevant to the question of voluntariness. Because the majority would conclude the warnings were inadequate, its voluntariness analysis is gratuitous, highlighting a dogged determination to quarrel with the factual record as much as possible.
“[Cjourts look to the totality of circumstances to determine whether a confession was voluntary.” Withrow v. Williams, 507 U.S. 680, 693, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993). Those circumstances include police coercion; the length of the interrogation; its location; its continuity; and the defendant’s maturity, education, physical condition, and mental health. Id. Issuance of valid Miranda warnings is a particularly weighty factor: “cases in which a defendant can make a colorable argument that a self-incriminating statement was ‘compelled’ despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare.” Berkemer v. McCarty, 468 U.S. 420, 433, n. 20, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).
To overcome the factual obstacles, the majority attempts to paint Doody as a tender youth, lacking intellect or sophistication, younger than his chronological age of seventeen-and-one-half years.[4] But the facts as found here by the Arizona judges do not support such a characterization. The Arizona Court of Appeals reviewed the evidence presented at the ten-day evidentiary hearing, including all thirteen hours of the audio-taped interrogation. It made, or adopted from the trial court, a number of express factual findings supporting its legal analysis. These findings recite Doody’s age, education, and school *1042 activities, including that he was six months from the age of majority, maintained a B grade average, held the position of commander of the ROTC Honor Guard and Color Guard, was employed on the military base, and that he spoke English fluently and displayed no signs of mental disability. Doody, 930 P.2d at 445-46.
The Arizona Court of Appeals also concluded Doody was adequately informed of his Miranda rights. It found that, although the interview lasted nearly thirteen hours, Doody made an inculpatory statement after about two and one-half hours by admitting to borrowing the murder weapon and began to make a full confession after about six hours. “The detectives used a variety of approaches in questioning Doody” but maintained a “courteous, almost pleading style of questioning during most of the interview.” Id. at 446. The detectives allowed Doody to take bathroom breaks and offered him food and drinks throughout the interrogation.[5] Id. The court also carefully noted the jury’s voluntariness finding: “[i]n this case, as in all others, the jury was the ultimate arbiter of voluntariness, and [was] free, in effect, [to] disagree with the judge, and reject the confession.” Id. at 448(quotation omitted, alterations in original).
The Arizona Court of Appeals identified the correct federal constitutional standards, looking to “the totality of the circumstances surrounding the confession” to determine “whether the will of the defendant [had] been overborne.”[6] Id. at 445. The court also noted that juvenile confessions require the “‘greatest care,’” and proceeded to “ ‘evaluate whether police conduct was coercive in the context of a juvenile confession by carefully scrutinizing not only the external circumstances under which the juvenile was questioned but also the juvenile’s reasonably apparent cognitive abilities.’” Id. (quoting State v. Jimenez, 165 Ariz. 444, 799 P.2d 785, 790 (1990)).
Applying this standard to the facts found above, the court concluded the confession was voluntary. It did not make this determination lightly or casually. The court noted each of the most disturbing circumstances and cited specific facts that counter-balanced those concerns. The “troublesome length” of the interrogation was offset by the fact that Doody had admitted after only two and one-half hours that he had possessed the murder weapon and confessed to participating in the temple robbery approximately four hours later. Id. at 446. The interrogation lasted through the night, but the audio tapes confirmed the officers’ testimony that Doody did not seem overly tired or distraught. Id. The officers engaged in numerous interrogation techniques, which the trial court characterized as “aggressive, energetic [and] forceful,” id., but they were not egregious or beyond the bounds of federal law, id. at 447-48.
Doody did not have a parent present, but, as the court noted, he had said he “did *1043 not care” whether his parents were there and agreed to speak to the detectives alone. Id. at 446. He was also living on his own with friends, not with his family. On the basis of this extensive and thoughtful analysis, the Arizona Court of Appeals concluded the confession was voluntary. As Chief Judge Kozinski’s concurrence correctly recognizes, “[t]his is precisely the kind of debatable application of a ‘general standard’ where finality and respect for the independent judgment of the state courts counsels the highest deference on federal habeas review.” Concurrence at 1025 (citing Knowles, 129 S.Ct. at 1420).
The majority cannot point to any significant fact or circumstance that the Arizona Court of Appeals failed to consider in reaching this conclusion. The majority claims Doody’s age is of “critical importance.” Of course it is important. That is why the Arizona court explicitly considered it. Doody, 930 P.2d at 445 (noting Doody’s age and reciting the correct legal standard for review of juvenile confessions). The court noted several facts showing Doody was mature for his age, including that he commanded the ROTC Honor Guard and Color Guard and held a job at the Luke Air Force Base commissary, id.; evidence in the record forther showed that Doody was the oldest of four children, lived in an apartment emancipated from his parents, signed his apartment lease for himself and his roommates, bought two cars on his own, and partieipated in the Civil Air Patrol, which comported with his plans for college and possibly joining the Air Force or Navy as a pilot. These facts no doubt explain why the Superior Court of Arizona had ordered Doody to stand trial as an adult, rather than as a juvenile offender. Id. at 444.
The Arizona Court of Appeals also discussed the possibility of police coercion, id. at 447-48; the length of the interrogation, id. at 446; its continuity, id. (noting that the interrogation lasted thirteen hours without significant breaks but also that the officers “offered Doody food and drinks and accommodated his requests to use the restroom”); and Doody’s maturity, education, physical condition, and mental health, id. at 445-46 (discussing Doody’s education, grade average, school activities, condition during the interrogation, and that there was “no indication of any mental disorder”).[7] See Withrow, 507 U.S. at 693, 113 S.Ct. 1745(requiring consideration of police coercion, the length of the interrogation, its location, its continuity, and the defendant’s maturity, education, physical condition, and mental health). Of course, the court also devoted an entire section of the opinion to the Miranda warnings. Doody, 930 P.2d at 448-49.
The state court correctly applied federal law to its factual conclusions. Each relevant circumstance, and many combinations of similar circumstances, have been addressed by the Supreme Court and circuit courts of appeal,[8] and the resulting confes *1044 sions held voluntary. We have repeatedly held a suspect’s minor age and the absence of a parent do not make a confession presumptively involuntary. See Juan H. v. Allen, 408 F.3d 1262, 1273 (9th Cir.2005) (fifteen-year-old suspect’s confession voluntary though police implored him to cooperate and misrepresented legal implications of admitting involvement); United States v. Doe, 155 F.3d 1070, 1075-76 (9th Cir.1998) (en banc) (seventeen-year-old suspect’s Miranda waiver and confession were voluntary, even though his parents were not present, where juvenile did not appear to be intoxicated, was not handcuffed, did not have trouble understanding the questions, the investigating officers did not make any threats or promises of any kind, and juvenile never asked that his parents be notified or that they be present).
Federal courts have also held lengthy interrogations are not per se coercive. See Clark v. Murphy, 331 F.3d 1062, 1073 (9th Cir.2003) (defendant’s confession was voluntary though he had been held and intermittently questioned in a small room for eight hours); Jenner v. Smith, 982 F.2d 329, 334(8th Cir.1993) (six or seven hour questioning not coercive); United States v. Lehman, 468 F.2d 93, 101 (7th Cir.1972) (“vigorous” eight-hour questioning with few breaks did not make confession involuntary). “Even if we assume that the interrogation lasted all day ... coercion typically involves far more outrageous conduct.” United States v. Haswood, 350 F.3d 1024, 1028 (9th Cir.2003).
The majority attempts to distinguish these cases as not involving both a seventeen-year-old suspect and a thirteen-hour interview. However, the Supreme Court has not addressed a case with facts such as those presented here. The majority does not claim that the Court has, yet it nevertheless concludes that the Arizona Court of Appeals not only incorrectly, but unreasonably, applied nonexistent Supreme Court precedent. Such a holding is not only violative of § 2254(d), see Knowles, 129 S.Ct. at 1419, but is also wholly irrational. While a right may be clearly established even without a Supreme Court case addressing materially indistinguishable facts, the majority cannot point to a single case that would have put the Arizona court on notice of a per se rule that a defendant of Doody’s age and maturity cannot make a voluntary confession six hours into a thirteen-hour interview.
In fact, the case that serves as the backbone of the majority’s attempt to refute this dissent, Haley, 332 U.S. at 600, 68 S.Ct. 302, is readily distinguishable. In Haley, the defendant was a fifteen-year-old African American “lad” in 1945 Ohio, id., arrested at his home where he lived with his “closest friend — his mother,” id., taken to police headquarters, reportedly beaten, denied contact with his mother, and “not advised that he was not obliged to talk, that it was his right if he chose to say not a word, nor that he was entitled to have the benefit of counsel or the help of his family,” id. at 604, 68 S.Ct. 302. The chief of police even “admitted that while he knew the boy ‘had the right to remain mute and not answer any questions,’ he did not know that it was the duty of the police to apprise him of that fact.” Id.
Here, valid pre-printed Miranda warnings were read to Doody before the disputed explanations; the officers did not beat Doody; Doody was held for thirteen hours rather than “days,” id.; the officers expressly asked Doody if he wanted his parents present; the officers knew, and advised Doody, that he had the right to remain silent; and most importantly, Doody was not a fifteen-year-old “lad” living with his closest friend — his mother'— but was instead a seventeen-and-one-half-year-old commander of the ROTC Honor *1045 Guard living independently of his parents with his closest Mend — the provider of the murder weapon — Rolando Caratachea.[9]
The majority argues that the Arizona Court of Appeals should have been mindful of the “tender age” of Doody, just as the Supreme Court was mindful of the “tender age” of Haley. Notwithstanding the materially distinguishable facts of the two cases, the court did expressly consider Doody’s age. Doody, 930 P.2d at 449. “More to the point, the question is not whether a state court could plausibly extend Haley to this fact pattern, a point we need not decide; the question is whether the [state] courts acted unreasonably in declining to extend this pre-Miranda precedent here. They did not.” Jackson, 525 F.3d at 435.
Nor were the Arizona courts required to find “outrageous conduct” in the officers’ interrogation tactics. “The policeman is not a fiduciary of the suspect. The police are allowed to play on a suspect’s ignorance, his anxieties, his fears, and his uncertainties; they just are not allowed to magnify those fears, uncertainties, and so forth to the point where rational decision becomes impossible.” United States v. Rutledge, 900 F.2d 1127, 1130 (7th Cir. 1990). Absent physical coercion, police are permitted to engage in a variety of psychologically coercive interrogation tactics. See Haynes v. Washington, 373 U.S. 503, 514-15, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963). The officers here employed most of them: the good cop/bad cop routine, lecturing on the importance of telling the truth, appeals to Doody’s courage and hon- or, urging him to act like a man, advising him that other participants were talking and pointing fingers at Doody, expressing concern for the safety of Doody’s family, and plain dogged persistence in their questioning.
These techniques are not new. Nor are they unconstitutional. For instance, police may encourage a suspect to cooperate and imply the suspect will be treated leniently for doing so. See Rutledge, 900 F.2d at 1128, 1130, 1131 (finding confession voluntary where police made “not quite truthful” statement that “all cooperation is helpful,” though confession actually exposed Rutledge to a heavier sentence). This is true even when the suspect is a juvenile. We have upheld voluntariness findings where officers implored a fifteen-year-old suspect to cooperate and “misrepresented the serious potential legal consequences [the suspect] would face were he to admit involvement.” Juan H., 408 F.3d at 1273. “It is not enough, even in the case of a juvenile, that the police ‘indicate that a cooperative attitude would be to [the] benefit’ of an accused unless such remarks rise to the level of being ‘threatening or coercive.’ ” Id. (quoting Fare v. Michael C., 442 U.S. 707, 727, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979)).
Deception is also a permitted tactic. “Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within Miranda’s concerns.” Illinois v. Perkins, 496 U.S. 292, 297, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990). *1046 “ ‘[T]rickery is not automatically coercion. Indeed, the police commonly engage in such ruses as suggesting to a suspect that a confederate has just confessed or that police have or will secure physical evidence against the suspect.’ ” United States v. Crawford, 372 F.3d 1048, 1061(9th Cir. 2004) (quoting United States v. Byram, 145 F.3d 405, 408 (1st Cir.1998)); see also Frazier v. Cupp, 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) (holding that confession was voluntary even though the officer falsely told the suspect that his co-conspirator had confessed to the crime).
Persistent questioning must be permissible, for “[f]ew criminals feel impelled to confess to the police purely of their own accord, without any questioning at all.” Miller v. Fenton, 796 F.2d 598, 604-05 (3d Cir.1986) (citing Stein v. New York, 346 U.S. 156, 186, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953) (“Of course, these confessions were not voluntary in the sense that petitioners wanted to make them or that they were completely spontaneous, like a confession to a priest, a lawyer, or a psychiatrist. But in this sense no criminal confession is voluntary.”), ovemtled on other grounds by Jackson v. Denno, 378 U.S. 368, 391, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964)); see also Haynes, 373 U.S. at 514-15, 83 S.Ct. 1336 (“Of course, detection and solution of crime is, at best, a difficult and arduous task requiring determination and persistence on the part of all responsible officers charged with the duty of law enforcement. And, certainly, we do not mean to suggest that all interrogation of witnesses and suspects is impermissible. Such questioning is undoubtedly an essential tool in effective law enforcement.”). Although the officers were persistent, they were not coercive, and the Arizona courts reasonably concluded Doody’s “confession [was] the product of an essentially free and unconstrained choice by its maker.” Schneckloth v. Bustamonte, 412 U.S. 218, 225, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).
Contrast the circumstances of Doody’s interrogation with other Supreme Court cases finding truly coercive circumstances. See, e.g., Mincey v. Arizona, 437 U.S. 385, 396-402, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (suspect interrogated for four hours in intensive care unit, with tubes in his throat and nose, heavily medicated, after being shot, despite explicit request for counsel); Darwin v. Connecticut, 391 U.S. 346, 347-49, 88 S.Ct. 1488, 20 L.Ed.2d 630 (1968) (per curiam) (suspect interrogated for 48 hours incommunicado while officers denied access to counsel); Greenwald v. Wisconsin, 390 U.S. 519, 519-21, 88 S.Ct. 1152, 20 L.Ed.2d 77 (1968) (per curiam) (defendant, with a ninth-grade education, was questioned without Miranda warnings for over eighteen hours and prevented from eating, sleeping, and taking his medication); Beecher v. Alabama, 389 U.S. 35, 36-38, 88 S.Ct. 189, 19 L.Ed.2d 35 (1967) (per curiam) (officer fired rifle next to suspect’s ear and said “If you don’t tell the truth I am going to kill you”); Clewis v. Texas, 386 U.S. 707, 709-12, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967) (suspect was arrested without probable cause, interrogated for nine days with little food or sleep, and gave three unwarned “confessions,” each of which he immediately retracted); Davis v. North Carolina, 384 U.S. 737, 745-53, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966) (defendant was interrogated “daily” for sixteen days, during which no one other than the police spoke to him, and during which he was fed an “extremely limited” diet); Reck v. Pate, 367 U.S. 433, 439-42, n. 3, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961) (mentally disabled youth interrogated incommunicado for a week “during which time he was frequently ill, fainted several times, vomited blood on the floor of the police station and was twice taken to the hospital on a stretcher”). It was entirely reasonable for the Arizona courts to conclude Doody’s confession did not fall into this category.
*1047 In light of the Arizona courts’ extensive findings and careful application of federal law, the best the majority can do is to mischaracterize the state court findings and reevaluate the record. The majority first attacks the Arizona Court of Appeals’ finding that Doody was “alert and responsive,” claiming he was actually non-responsive and often silent.[10] But the court never said Doody spoke constantly or answered every question, and it explicitly noted that “Doody did not speak for long periods during the interrogation.” Doody, 930 P.2d at 447. The majority wants to interpret Doody’s failure to answer certain questions as “unresponsive.” The Arizona court obviously viewed his failure to immediately answer in a more sinister light; Doody could have been thinking up a tale explaining his admission that he was at the murder scene in a non-incriminatory fashion. Doody ultimately admitted that he was at the Buddhist temple but claimed to be outside when the murders occurred.
The finding that he was “alert and responsive” was not unreasonable, even in light of Doody’s silence, for there is more to alertness than perpetual chatter. Doody could certainly have been pondering the consequences of truthfully answering the detectives’ questions. Of course, silence may be indicative of inattention or unresponsiveness, but visual clues and physical demeanor must also be considered. The majority goes to great length to note that Doody sat in a chair with a “straight, immobile back.” Maj. Opinion at 1011 n.8; see also id. at 1008-09, 1015. If anything, this would bolster the detectives’ observations as to Doody’s alert and responsive demeanor. The audio tapes, though certainly better than a cold transcript, cannot provide this information. Only the detectives who interrogated Doody could provide that, and they swore that Doody was “alert and responsive throughout the interrogation and did not appear overtired or distraught.” Doody, 930 P.2d at 446. Doody declined to testify at the evidentiary hearing, so the record is devoid of direct evidence contradicting the officers’ description. Id.
Because the trial court explicitly credited that testimony, the majority commits reversible error in dismissing the state court’s finding as an “unreasonable determination of the facts.” The majority instead misconstrues the limits of our review under § 2254(d). The majority argues that “assuming that there was equivocal evidence of responsiveness, the Arizona Court of Appeals’ finding that no evidence supported Doody’s claim was unreasonable.” Maj. Opinion at 1013 (first and third emphases added). Yet, because “Congress specifically used the word ‘unreasonable,’ and not a term like ‘erroneous’ or ‘incorrect,’ a federal habeas court may not grant relief simply because it concludes in its independent judgment that the relevant state-court decision” was erroneous or incorrect. Williams, 529 U.S. at 366, 120 S.Ct. 1495. The majority fundamentally alters the permissible scope of our review by ignoring this distinction. See Richter, 131 S.Ct. at 786; Uttecht, 551 U.S. at 10, 127 S.Ct. 2218.
The majority next deems unreasonable the finding that “the audio tapes reveal a courteous, almost pleading style of questioning during most of the interview.” Doody, 930 P.2d at 446; see Maj. Opinion at 1012. The majority reviews the tapes and scolds that the officers’ tones were “far from pleasant.” Maj. Opinion at 1013. This was no tea party. The Arizona court *1048 did not treat it like one. The officers were unquestionably persistent in seeking, and sometimes demanding, information from a suspected mass murderer. That is what we pay them to do. But it is entirely accurate to say the officers were “courteous, almost pleading” for “most of the interview.” Doody, 930 P.2d at 446 (emphasis added). Finding a courteous tone for most of the interview does not conflict with the fact that the officers were sometimes sarcastic, demeaning, and unpleasant.
For hours at a time, the officers pleaded, cajoled, and implored in soft voices. Their questions were nearly inaudible on the tape at some points. For several additional hours, particularly at the beginning and end of the interview, the officers asked questions in conversational tones. Even in the early hours of the morning, when the officers were most demanding and unpleasant, they did not scream or shout. They did not threaten Doody in any way. They did not pound the table or throw objects around the room. They did not put words in Doody’s mouth as to how the murders had been planned or committed. If we are going to say that mere persistence in interrogation renders a confession involuntary, and that a suspect’s will is overborne by insistently repeated questions, and moreover that it’s objectively unreasonable for a court to decide otherwise, then there is no rational stopping point in our voluntariness analysis.[11]
Indefatigable in its mischaracterization of the state court’s findings, the majority next claims that, “contrary to the finding of the Arizona Court of Appeals, Doody decidedly did not admit to involvement in the temple murders after two and one-half hours of questioning.” Maj. Opinion at 1014. The court of appeals did not say Doody “admitted to involvement” after two and a half hours. It said, “Doody admitted he had borrowed Caratachea’s rifle at the time of the temple murders.” Doody, 930 P.2d at 446. This is a reasonable finding of fact. It is also a significant admission because it contradicts the lie he told at the outset of the interview that he had never had possession of the rifle. Doody said he borrowed the rifle “close to the end of June.” The murders occurred in August. Considering the Arizona Court of Appeals reviewed the case roughly five years later, “at the time” reasonably describes the time frame. It is disingenuous to rewrite the state court’s findings in order to declare them “patently unreasonable.” Maj. Opinion at 1014. Although not conclusive, the inculpatory admission that he possessed the murder weapon before the temple invasion provided a strong basis for the officers to believe Doody had some involvement in the robbery and murders, contrary to his initial denial when first questioned.
Finally, the majority faults the Arizona Court of Appeals for analyzing “the individual circumstances of the interrogation without weighing the totality of the eir *1049 eumstances.” Maj. Opinion at 1015. Given that federal law requires state courts to examine a long list of particular factors, this criticism is utterly confounding. Had the state court merely alluded to a vast morass of evidence and stated a summary conclusion, we might arguably reverse for failure to explicitly consider all the relevant circumstances. The majority now implies that individual consideration of each important factor is error. A state court earnestly trying to follow our conflicting dictates might as well throw in the towel.
V
The majority’s lengthy recital of the facts highlights the fundamental error in its approach. Despite the prolific factual recitation, the majority leaves key sentences, exchanges, and pages of transcript unaccounted for. The majority quips that the dissent would “prefer that these audiotapes not see the light of day.” Maj. Opinion at 1022 n.14. To the contrary, if the majority is going to ignore AEDPA and parse the record, then all of the transcripts should see the light of day, not just pre-selected snippets. Rather than deferring to the reasoned decisions of the Arizona courts, which listened to the tapes m toto, the majority re-weighs the facts, parses the transcript, and dismissively ignores the state court’s findings. The opinion once again manifests judicial disregard of our role as federal appellate judges and the comity enshrined in AEDPA’s statutory commands. See Richter, 131 S.Ct. at 780, 786-87.
The Arizona courts did everything we can demand of state courts. The trial court held a ten-day evidentiary hearing before concluding the Miranda warnings were adequate and the confession was voluntary. More importantly, the jury independently and necessarily concluded the confession was voluntary and reliable in convicting Doody for his role in the murders. The Arizona Court of Appeals affirmed this determination in a comprehensive, reasoned opinion. Its holding on the facts presented fell squarely within the bounds of Supreme Court precedent on voluntariness. In sum, sixteen Arizona factfinders concluded Doody’s confession was voluntary. Presumably at least some of them were “fairminded jurists.” AED-PA at 28 U.S.C. § 2254(e)(1) cloaks those findings with a presumption of correctness. Doody fails to meet his statutory burden to rebut them by “clear and convincing evidence.” Id.
In violation of AEDPA, the majority adjusts the scales and weighs the facts anew. This sort of appellate factfinding on habeas review is contrary to the congressionally mandated standard of review. It also creates unpredictability for habeas petitioners, attorneys, and state and federal courts. “We have been told before that objectively unreasonable means something more than we think the state courts were wrong. ‘[A]n unreasonable application of federal law is different from an incorrect application.’ ” Anderson v. Terhune, 516 F.3d 781, 800 (9th Cir.2008) (en banc) (Tallman, J., dissenting) (quoting Williams, 529 U.S. at 410, 120 S.Ct. 1495). Such careless dismissal of reasoned findings is demoralizing and insulting to the state courts, eschewing the principle that “comity between state and federal courts has been recognized as a bulwark of the federal system.” Allen v. McCurry, 449 U.S. 90, 96, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); see also Richter, 131 S.Ct. at 786-87.
With little more than a hat tip to the Arizona courts’ extensive findings, the majority nonetheless concludes these findings were “objectively unreasonable.” The majority’s message to our state courts is clear: no matter how carefully you decide constitutional issues in criminal cases, no matter how well you justify your opinions *1050 with evidence of record, we will cast your work aside simply because we disagree. We should instead heed the dictates of the United States Supreme Court and give the reasonable findings of the Arizona courts the deference due under AEDPA. spectfully dissent. I re-
Appendix
[[Image here]]

. The majority is mistaken when it suggests that Richter’s forceful admonitions regarding AEDPA deference apply only in the context of Strickland claims. See Maj. Opinion at 1007 n.5. The fact that Richter acknowledged both that the petitioner's case raised a challenge to a state court’s application of the Strickland standard, 131 S.Ct. at 780, and that the Strickland standard is itself a deferential one, id. at 788, is unremarkable and in no way suggests that AEDPA somehow operates differently depending on the nature of the underlying habeas claim. Furthermore, in Richter, the Court explicitly indicated that it took issue with the Ninth Circuit’s misapplication of the AEDPA standard generally. See id. at 785 (noting that the Ninth Circuit’s opinion under review "discloses an improper understanding of § 2254(d)’s unreasonableness standard and of its operation in the context of a Strickland claim”) (emphasis added). Indeed, the AED-PA reversals I cite on pages 1029-30 are not confined to Strickland claims or to any other particular type of claim. The relevance to the case we now review of Richter's repeated elucidations of the high level of deference we must accord under AEDPA is in no way diminished simply because Richter involved a different type of underlying claim. When the Supreme Court condemns our “judicial disregard” for AEDPA, Richter, 131 S.Ct. at 780, it is time to pay heed.

. Garcia also moved to suppress his own confession, but thereafter entered into a plea agreement in which he pled guilty to nine counts of first degree murder and one count of burglary. He also agreed to testify against Doody. In exchange, the prosecution agreed not to seek the death penalty against Garcia.

. The majority substitutes its judgment for that of the Arizona courts so many times that it becomes second nature, and thus, almost unnoticeable. Many times over, the majority simply disagrees with the Arizona Court of Appeals, but labels any interpretation contrary to its own "unreasonable.” For example, the majority writes, "To the contrary, the audiotapes demonstrate that the detectives’ relentless and uninterrupted interrogation of an unresponsive juvenile was far from courteous.' ” Maj. Opinion at 1013. This court cannot make that determination on habeas review under AEDPA. 28 U.S.C. § 2254(e)(1) (“[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.”). Yet the majority persists, arguing that any doubt regarding this matter "is easily resolved by listening to the audiotapes.” Maj. Opinion at 1013. Under AEDPA, it is not our role to resolve "doubt” in the factual record and then conclude that the state court was unreasonable not to see it our way.

. Particularly indicative is the majority's heavy reliance on the Supreme Court's 1948 opinion in Haley v. Ohio, 332 U.S. 596, 598, 68 S.Ct. 302, 92 L.Ed. 224 (1948), where the Court characterized the suspect — questioned for five hours straight and, as he maintained, beaten — as a fifteen-year-old “lad” still living with his mother. Id.

. The majority faults the officers because according to its interpretation of the transcript the first break comes nine hours into the interview. Maj. Opinion at 1011. Yet, the officers paused questioning less than four hours into the interview to offer Doody something to drink and a bathroom break. At the end of Tape 3, Detective Riley asks, "Are you a little thirsty?" Doody responds, "Not quite, no." Detective Riley then inquires, "You sure? You look like you're a little bit thirsty, you want to go to the bathroom or anything?" Doody states, "No.” Detective Riley then confirms, “You sure? Okay.” The majority’s suggestion that the officers were insensitive to Doody's need for relief throughout the interrogation is belied by this record.

. The majority inexplicably asserts the state court unreasonably applied federal law by failing to weigh "the totality of the circumstances . ” Maj. Opinion at 1015.

. The only factor the Arizona Court of Appeals apparently omitted was the location of the interrogation. Other than noting the interview took place at the police station, the state court did not describe the physical surroundings. If anything, this factor would cut in favor of voluntariness. In contrast to a typical stark interrogation room, Doody’s interrogation took place in what had been the office of a Maricopa County attorney, roughly ten feet by eighteen feet in size, well-lit, with carpeted floors and padded chairs. The officers did not lock the door.

. "While circuit law may be 'persuasive authority’ for purposes of determining whether a state court decision is an unreasonable application of Supreme Court law, only the Supreme Court's holdings are binding on the state courts and only those holdings need be reasonably applied.” Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir.2003) (internal citations omitted).

. We would not be the first circuit to distinguish Haley on such bases. See United States ex rel. Hayward v. Johnson, 508 F.2d 322, 326 (3d Cir. 1975) (distinguishing on the basis that suspect was "informed of his right to remain silent”), overruled on other grounds by Patterson v. Cuyler, 729 F.2d 925 (3d Cir.1984); Rogers v. Quarterman, 555 F.3d 483, 495 (5th Cir.2009) (distinguishing on the basis that suspect was not "subjected to physical abuse” and was "detained for a period of hours rather than days”); Jackson v. McKee, 525 F.3d 430, 435 (6th Cir.2008) (distinguishing on the basis that suspect "by contrast, was older (17 years old)”); Hardaway v. Young, 302 F.3d 757, 763 (7th Cir.2002) (distinguishing on the basis that suspect "was held for less than one day rather than three”).

. The majority neglects to mention that Doody becomes talkative, forthcoming, and almost chatty in the last several hours of the interrogation. He provides most of the details of the crime with minimal prompting from the officers.

. The majority’s conclusion that the police "undoubtedly” used the same interrogation techniques against Doody as they did in procuring the Tucson Four’s confessions, Maj. Opinion at 1013, is remarkable, considering the Arizona Court of Appeals found that Doody had waived that contention as part of a due process claim. He convinced the trial court to admit the Tucson Four’s confessions by arguing they were true and reasonably showed someone else committed the crime. Doody, 930 P.2d at 449-50. The court of appeals also found that Doody made "no [] showing” in state court that the circumstances of the Tucson Four confessions were relevant to his own, and that "the record disclose[d] substantial differences in approach and questioners” between Doody's and the Tucson Four’s interrogations. Id. at 450-51. Doody fails to challenge these state court findings on appeal, while the majority simply ignores them, again in disregard of AEDPA.